2023 IL App (1st) 221558
Opinion filed July 25, 2023
SECOND DIVISION

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF<br>JOHN MATTHEW KENNEY JR., | ) ) | Appeal from the Circuit Court<br>of Cook County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | No. 2018 D 5945 |
| | ) | |
| JANET AMBER STRANG, | ) | |
| | ) | The Honorable |
| Respondent-Appellee. | ) | Debra Walker,<br>Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Howse and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    Following the filing of his petition for dissolution of marriage, petitioner-appellant John Matthew Kenney Jr. (John) and respondent-appellee Janet Amber Strang (Amber) proceeded through protracted litigation until the trial court entered its bifurcated judgment that is the subject of the instant appeal. Of relevance here, the trial court granted Amber's request to relocate the parties' minor children from Cook County, Illinois, to Colorado Springs,

Colorado. John appeals that determination, contending that the trial court erred in failing to regard the case as a relocation matter pursuant to statute, erred as a matter of law when it disregarded a prior legal finding, and ultimately erred in weighing the evidence presented. He asks that we reverse the trial court's decision granting Amber's request and/or remand the matter. For the following reasons, we affirm.

¶ 2                                                      BACKGROUND

¶ 3        As noted, the record herein is voluminous and the litigation between the parties was intense. Some 10 witnesses testified at trial with respect to the children and the issues of parental decision-making, allocation of parenting time, and relocation, including the parties, court-appointed and retained professional witnesses, and various lay witnesses. We present those facts pertinent to the court's decision regarding relocation, as that is the only portion of its decision at issue on appeal.

¶ 4        In April 2016, very shortly after they began dating, John and Amber discovered they were pregnant with twins. They married on June 24, 2016, in Santa Barbara, California. At the time, John, an attorney licensed in Illinois, was working in Chicago and owned property on North Willard Street; his immediate family, including his parents, siblings, and their children lived in the area. Meanwhile, Amber, a commercial real estate agent, was working and living temporarily in Dallas, Texas, but also maintained a home in Colorado Springs, Colorado which she had owned for at least a decade; her immediate family, including her parents, siblings, and their children, lived in that area.

¶ 5        Essentially, the parties split their time between Illinois and Colorado during the pregnancy and marriage. For example, they traveled regularly and very often to and from the

areas (alone and together) until Amber could no longer travel medically. They then chose to deliver the twins in Chicago at Northwestern Medical Center (Northwestern) due to its excellent neonatal unit. Amber reserved day care and Montessori school spots for the twins before they were born at facilities in Chicago. (However, they were never enrolled here.) John and Amber also agreed to renovate John's Willard Street property for the twins' arrival; they hired an interior designer with whom Amber and her mother met, and Amber signed a lease for an apartment near that home where they could stay during the renovations.

¶ 6     The parties' twins were born prematurely on December 16, 2016, at Northwestern. Due to complications, they were admitted to the neonatal intensive care unit and were not released from the hospital until the end of January 2017. The twins needed physical therapy and follow-up care for a heart murmur and plagiocephaly, and they saw doctors in Chicago until approximately March 2018.[1] However, as soon as they were cleared to travel in April 2017, four months after their birth, Amber began traveling with them frequently and regularly between Chicago and Colorado Springs, splitting time between the two cities, while John typically stayed in Chicago to work. As the record demonstrates, these trips were consistent and almost monthly, and they would spend two or more weeks in each location (sometimes more, sometimes less). Accordingly, the twins consistently remained with Amber for a vast majority of the time, and she was their primary caregiver. In addition, when she had to travel for business, she often flew with the children to Colorado and left them in the care of her parents, as opposed to leaving them with John in Chicago. While Amber applied for a gym membership for her and the children in Chicago, she never obtained an Illinois driver's

---

[1]The twins continue to have some health problems related to their premature birth.

license, never voted in Illinois, and never became affiliated with any church here; in fact, the parties agreed to have the twins baptized in Colorado, which they did. The children also saw health providers in both Chicago and Colorado during this time. With respect to tax returns, in 2016, John and Amber first filed married but separately, with John using Chicago as his residence and Amber using Colorado as hers; they later amended their federal return to file married and jointly, using Chicago as their residence. In 2017, they filed a joint federal return, this time using Colorado as their residence, and they each filed separate state returns, with John filing an Illinois return and Amber filing a Colorado return. The parties also filed a tax return for the twins, who received income from modeling, and that return listed Colorado as their residence. Additionally, John applied to be admitted to practice law in Colorado and completed the state's licensure process. In May 2018, he drove Amber's car and towed his boat to Colorado, where he left it. And, the parties together applied for passports for the twins, and both attested that the twins' residence was Colorado.

¶ 7        On May 1, 2018, Amber and the twins went to Colorado. They did not return to Chicago.

¶ 8        On July 26, 2018, John filed a petition for dissolution of marriage in Illinois, as well as an "Emergency Motion for the Return of the Minor Children to their Home State." In his emergency motion, he claimed the twins' home state was Illinois, asserting they were born here, received medical care here, and the parties resided here in the leased apartment. He alleged he and Amber intended to move into the Willard Street property once construction was completed, with Amber taking the children to Colorado in May for what was supposed to be a temporary stay, but then refused to return to Chicago. Four days later, on July 31,

2018, Amber filed a petition for dissolution of marriage in Colorado.[2] In August 2018, Amber moved (among other things) to dismiss John's petition for dissolution in Illinois for lack of personal jurisdiction, alleging her residence throughout the marriage had always been Colorado, and her contact with Illinois was limited to only birthing the children, leasing the apartment to be close to the hospital due to the children's medical needs upon birth, and returning only for their necessary medical appointments from time to time.

¶ 9    On March 15, 2019, the trial court, following a hearing, denied Amber's motion to dismiss John's petition for lack of personal jurisdiction, finding her claims that she was only in Illinois for the birth of the children to be "without merit." First, with respect to Amber herself, the court, after examining the Illinois long-arm statute (735 ILCS 5/2-209 (West 2018)), concluded that it had jurisdiction over her as she had sufficient contacts with Illinois, including signing the apartment lease, applying for day care before the twins were born, and performing work here via her employment. With respect to the children, the court stated that the question of whether it had jurisdiction over them "is much more involved." The court noted that section 201(a)(1) of the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA) gives a state jurisdiction to make an initial custody determination only if it is the "home state" of the children at the time of the commencement of the proceeding "or was the[ir] home state *** within 6 months before the commencement of the proceeding and the child is absent from this State but a parent *** continues to live in this State." 750 ILCS 36/201(a)(1) (West 2018). It further noted that section 102(7) defines "home state" as the

---

[2]The record indicates that, because Amber failed to mention John's prior filing in Illinois in her pleading, which is in contravention of Colorado law, her petition was not addressed on its merits by that court.

state in which a child lived with a parent "for at least six consecutive months immediately before the commencement of a child-custody proceeding." 750 ILCS 36/102(7) (West 2018). Examining the evidence presented, the court commented that, in the case of these parties, "[t]he reality is that the children did not live in either Illinois or Colorado continuously for [a] six[-]month period immediately prior to the commencement of the action on July 26, 2018," and ultimately, "[t]here was no testimony adduced at trial indicating that the parties ever agreed as to where they would live with the twins." Because of this, the court turned to an examination of whether the twins and Amber had some significant connection to Illinois to qualify it as the twins' home state, and it found that there was. It cited, for example, that Amber continued to fly the twins to Chicago for medical appointments that their Chicago pediatrician confirmed could have been conducted by other doctors elsewhere, Amber brought them to a modeling casting call in Chicago, and she admitted she never told John she had no intention of permanently residing in Illinois or that she was not going to return with the children when she last left. The court concluded that, even though "[t]his is truly an issue of the parties having a multistate relationship," for the sake of the instant jurisdictional question, the twins' home state was Illinois.

¶ 10        Following this, Amber filed a "Petition to Relocate with Minor Children and Entry of a Parenting Plan and/or Allocation Order." In it, Amber averred that John was aware of her desire to raise the twins in Colorado since April 2017 and that Colorado has been her domicile for 12 years and her residence throughout the entire marriage. She further asserted that the children have spent the majority of their lives in Colorado and it is the most suitable environment in which to raise them for myriad reasons, including the home she owns there,

her extended family, educational opportunities, and her professional licensure. Multiple additional filings ensued between the parties, including a motion to dismiss Amber's petition to relocate, as well as petitions to enforce trial court orders and a petition and amended petition for temporary allocation of parenting time filed by John. Amid all this, the trial court appointed Pamela Kuzniar as guardian *ad litem* (GAL) for the twins and Dr. Alan Ravitz to perform an evaluation[3] regarding relocation and allocation of parental responsibilities and parenting time. Additionally, John filed his own motion for evaluation by a retained professional pursuant to statute, and Dr. Louis Kraus was permitted to issue a report, as well. Motion practice and hearings continued, and on September 9, 2020, while the trial court denied an emergency motion filed by John for temporary allocation of sole decision-making authority regarding preschool enrollment, it *sua sponte* ordered the parties to "exchange the children at an agreed location every two weeks" and to maintain this schedule while litigation proceeded. It also asked the parties to submit proposed allocation judgments regarding parental responsibilities and parenting plans. John's plan called for the children to remain in Illinois and for joint decision-making and equal parenting time, with the assumption that Amber would reside in Illinois. Amber's plan proposed relocation of the children to Colorado, final decision-making in some areas of their lives to be given solely to her, and a parenting schedule with visitation for John. In the meantime, the parties each filed motions seeking to enroll the twins in preschool in their respective states. The trial court entered an

---

[3]The parties raised some concern in the trial court with respect to certain portions of Dr. Ravitz's report containing an outdated legal standard, and urged it not to consider these portions. The record reflects that the trial court only considered Dr. Ravitz's report for its findings of fact and final evaluation provided and noted it did not consider any mention of a legal standard, as he was not ordered to provide one.

order allowing each party to do so for their parenting time, and the twins attended preschool half the month in La Grange, Illinois, and half the month in Colorado, in accordance with the court's imposed "two-week on, two-week off" schedule.

¶ 11    The cause finally proceeded to trial in June 2022. The twins were now 5½ years old and would soon attend kindergarten. Testimony and evidence provided by the witnesses was lengthy and is relatively uncontested by the parties. Accordingly, we summarize it briefly here.

¶ 12    John testified with respect to many topics covering time before the birth of the twins to the institution of the divorce proceedings and his current circumstances. John averred that when the parties married, they talked about living in Chicago; this is why they chose to renovate his Willard Street property and Amber leased the apartment near the hospital in the meantime. John described that Amber consistently participated in the renovations and communicated repeatedly with the interior designer they hired and that she extended the lease on the apartment amid construction. When the twins were born, they were living in Chicago. His legal practice required him to attend court hearings daily at various locations, while Amber worked remotely from an office in the parties' home. According to John, this allowed her to be the primary caregiver of the twins, including taking them to their medical appointments, which he could not attend. He also noted that she was the one who researched day care and schooling options for them, even before they were born, and regularly traveled with them to Colorado as soon as four months after their birth. He admitted that Amber was "pretty much exclusively" the one who cared for the twins. With respect to their divorce, John claimed that when the apartment lease ended, there was one last month of anticipated

construction on the Willard Street property, so they decided Amber would take the twins to Colorado for that time to stay at the property she maintained there, which she did in May 2018. When John informed her of the construction's completion in mid-June, Amber did not return and evaded his questions until she finally told him in July 2018 that she planned to stay in Colorado with the twins permanently. He filed his divorce petition soon thereafter.

¶ 13     In addition to testifying with respect to the ensuing proceedings, John discussed the many visits he had with the twins during this time, as well as trips he took with them and the increased court-ordered parenting time, which culminated in the two-week on/off schedule that had now been in place for the last two years. John further testified that he moved to La Grange, Illinois, where he now has a home, is located much closer to his legal practice, and is close to various extracurricular opportunities, parks, and religious and enrichment programs in which the twins can participate. He noted that the twins have neighborhood friends and a good relationship with their cousins and grandparents who live nearby and have helped care for them. He also testified about a typical day when he has the twins in Illinois, the area schools, and the fact that he has already enrolled them in kindergarten in his district. Finally, John testified that he did not consider the parties to have a multistate relationship but, rather, that the children had always lived in Illinois and had never lived in Colorado. In his view, Amber's travels to Colorado once the twins were born comprised nothing more than visits there. He averred that he never told Amber he would move to Colorado and he believed they intended to live in Illinois and raise the twins here.

¶ 14     John's sister, Elizabeth Kenney Augustine, who is also a La Grange village board trustee, testified regarding life in that city, her family's relationship with the twins, and her

9

observations of John's relationship with them. She discussed La Grange extensively, including its award-winning schools, parks, and recreational opportunities. She noted that she and her family live only seven blocks from John, that her children and the twins play together frequently, and that their families celebrate many holidays together. She also described John's relationship with the twins as very close, involved, and healthy, with enthusiastic and nurturing components. She further stated that she and Amber never discussed Amber, John, or the twins living outside Illinois.[4]

¶ 15      Like John, Amber testified with respect to topics ranging from before the birth of the twins to the institution of the divorce proceedings to her current circumstances. She stated that when she met and married John, she lived in corporate housing in Dallas while maintaining her home in Colorado, which she had had for many years. She averred that when she found out she was pregnant and that her pregnancy was high-risk, she signed the lease on the Chicago apartment so she could be near Northwestern Hospital in anticipation of medical care the twins would need upon and following their birth; she stated she extended the lease for the same reason. Amber testified that, once the twins were born, she was their primary caregiver, usually bathing, feeding, and putting them to bed before John arrived home from work, and that John never cared for them on his own during that time. Also, during that time, John's parents did not see the twins often. She discussed the twins' health problems upon birth and all the research she did, doctors she contacted, and medical appointments she took

---

[4]John presented the testimony of additional friends who further testified with respect to the benefits of living in La Grange as well as their observations of his relationship with the twins. As their testimony provided little impact on the trial court's decision at issue, we need not repeat it herein.

them to without John's assistance. Once the twins were able to fly, she started flying back and forth with them from Chicago to Colorado, doing so at least seven times between April 2017 and May 2018, whereupon she brought them to Colorado to stay permanently. She further testified regarding her home in Colorado, which she described as in a rural neighborhood that is only 10 minutes from Colorado Springs. She erected a playground on the property for the twins, and they maintain horses and family pets, including dogs and cats to which the twins are bonded. She also transformed her living room into a Montessori play space, and she has enrolled the twins for kindergarten in The Classical Academy, an area school. The neighborhood contains many other children who are friends with the twins; Amber has also started a moms' support group, and the twins participate in various extracurricular activities, with her parents interacting with/caring for them multiple times a week and her brother and sister and their families living nearby.

¶ 16    With respect to the two-week on/off parenting schedule, Amber testified it has been hard on the twins; she noted that they consider Colorado their home as it has been a constant place in their lives and as John had only recently purchased his La Grange home. Like John, she testified regarding a typical day with the children while they are with her in Colorado, as well as what she considered to be the positive and negative attributes of their time with John. Finally, Amber testified that she never intended, and she and John never spoke about, her developing her professional business in Chicago so as to move here; she never sought regular employment in Illinois. Rather, the plan had always been to allow John time to build a legal practice in Colorado, which he began by obtaining his law license there, and that they would then all move to Colorado to live as a family.

¶ 17        Wesley Jolly, director of academic services at The Classical Academy, testified with respect to this school at which Amber had enrolled the twins for its upcoming kindergarten term. Briefly, he stated that the school is the largest charter school in Colorado, it has 3700 students ranging from kindergarten to twelfth grade, and it focuses on "classical" education. He stated that kindergarten classes are capped at 18 students, sports and other extracurricular activities are offered, and electronic devices are purposefully limited. He further noted that the school consistently ranks in the top 10% to 20% of all schools in Colorado.

¶ 18        Court-appointed expert Dr. Ravitz testified about his evaluation of the parties with respect to relocation and the report he compiled and submitted to the trial court in June 2020. He explained that in this case, because the parties were clearly both adequate and competent parents, he did not feel the need to interview anyone other than them to complete an evaluation as to relocation, and that the parties' choice to live in different states will necessarily result in one of them losing their regular physical interaction with the twins upon the court's final decision. Moreover, he did not believe either party was being manipulative in choosing where they wanted to live, but rather, had good faith reasons for their desires and for wanting the children to stay with them. Dr. Ravitz did not refer to statutory relocation factors during his evaluation. His ultimate conclusion was that, from a "forensic mental health standpoint," the twins should remain in Colorado with Amber. He noted that, as far as general educational, social, and extracurricular opportunities, there was really no difference between growing up in Illinois versus growing up in Colorado. However, he found that Amber is their primary caregiver and has been for their entire lives, a fact John did not dispute during the evaluation. Accordingly, he noted that what distinguished Illinois and

12

Colorado most in this case was Amber's psychological well-being, which was of significant import, as her comfort level as a parent is directly tied to Colorado where her family is significantly involved in the twins' lives and upon whom she relies to provide care when she is not available. While he acknowledged that, at the time this cause was filed, the twins had spent the majority of their lives physically in Chicago, Colorado has been the twins' "primary home for all of their conscious lives." He believed that both parties loved the children and could meet their needs; however, he concluded that Amber would have more difficulty meeting those needs if she were in Illinois than John would have meeting those needs if he were in Colorado. It was his opinion that the twins should remain in Colorado with Amber and John should have extensive visitation with them.

¶ 19    Dr. Kraus, who, again, was retained upon John's motion, testified as to the report he provided to the trial court in 2020. In addition to speaking with John, Amber, and the twins, Dr. Kraus also interviewed family members on both sides, including both sets of grandparents, and he referred to statutory factors in his evaluation. Regarding Amber, Dr. Kraus commented that she was insistent that she and the twins had always lived in Colorado and that John long knew that this was the family's plan; however, Dr. Kraus noted that he found no information to verify this and he characterized Amber's trip with the twins to Colorado in May 2018 as "a set up[,] almost deception," giving the impression she was going to return but knew she would not. Regarding John, Dr. Kraus averred there was a strong bond between him and the twins during the evaluation with "very positive interaction." Dr. Kraus observed that both extended families were supportive of the twins, with John's in La Grange being larger and Amber's in Colorado being smaller, but with Amber's parents being

particularly involved with them and their spending more time with the twins to be an "immediate enhancement" for the twins should they remain in Colorado. Dr. Kraus additionally considered both schools at issue and determined their comparison to be "a wash." When asked to give his opinion within a reasonable degree of medical certainty whether the twins should relocate to Colorado, Dr. Kraus opined that they should not. He noted it would worsen the relationship between them and John and make it "more difficult to sustain in the level that would be sustained if he was having regular interactions with" them were they in Illinois. When asked about a reasonable parenting time schedule, he opined that one could not exist if the twins remained in Colorado and that one could only be implemented if the twins and both parents were in Illinois. However, he also opined that were both parties and the children to remain in the same state (either Illinois or Colorado), John should not be given equal parenting time, as he desired. Rather, Dr. Kraus recommended that John should have parenting time 5 out of every 14 overnights, with Thursday through Monday one week and Thursday only the next week, and that Amber should have the children the remaining 9 out of 14 overnights. Dr. Kraus pointed out that John admitted to him that when he and Amber were together, she typically performed 75% of the child care duties and he performed about 25%. Though acknowledging that the twins "could do well in either location," Dr. Kraus opined that the twins should not be allowed to relocate and should remain in Illinois due to the manner in which Amber left and the effect relocation would have on their relationship with John.

¶ 20     GAL Kuzniar testified with respect to her investigation, evaluation and report to the trial court, which included meetings with the parties and the twins, visits to the parties' homes,

discussions with Drs. Ravitz and Kraus, and supplemental reporting that brought her investigation through January 2022. Kuzniar described the cause as "more complex than simple relocation," as "the parties resided in two different states, and the children traveled from state to state." Noting the court's prior order that classified the parties' relationship as multistate and with the children not residing continuously in either state for a period of six months before the divorce petition was filed, Kuzniar believed the cause was not a traditional relocation matter but, instead, focused her investigation and evaluation slightly more on who would be the appropriate primary parent, with relocation to flow from that determination, namely, were it to be John, the children should live in Illinois and were it to be Amber, they should live in Colorado. Critically, Kuzniar testified that her investigation and reports examined every one of the statutory factors regarding relocation; she gathered information on each of them and provided that to the trial court.

¶ 21     It was Kuzniar's belief that the current situation arose because when John and Amber became involved and married, they never discussed her intent to remain in Colorado and his intent to remain in Illinois. With respect to Amber, Kuzniar testified that she "has been a hyper-diligent mom" who had prepared for the twins' education, medical care, and childcare since before they were born. Her home in Colorado affords each twin his own bedroom, and the boys share a bathroom; the home is arranged like a Montessori school and has a large basement, a playground, horses, and pets. The twins have a variety of activities available to them in Colorado, and they are very close to Amber's parents, who they see multiple times a week and who help care for them often. With respect to John, Kuzniar testified that he works long hours when the twins are not with him, and he would have to arrange childcare for them

were they to live in Illinois, as his parents could not care for them due to their ages and lack of mobility. At John's home, the twins share a bedroom and they and John share a bathroom. At the time of her visit, John's home was not childproofed and had some safety issues. While Amber was very detailed in communicating with John and quick to respond on the OurFamilyWizard app, John was slower to communicate and sometimes did not respond at all. Moreover, John admitted that Amber was the twins' "primary parent" and had no complaints about her care of them. Kuzniar examined the parties' proposed parenting plans, noting that Amber's acknowledged and provided for the parties living in different states while John's required them to both live in Illinois. She further averred that, even if the parties both lived in Illinois, John's own expert, Dr. Kraus, recommended John have less than the 50% parenting time his proposal sought. Kuzniar stated she, likewise, would not support giving John primary residency of the children in Illinois. Ultimately, Kuzniar's recommendation was that the twins should reside in Colorado with Amber. Since the parties wanted to remain in their respective states, she would support Amber as the primary parent, a conclusion she noted was in line with both Drs. Ravitz's and Kraus's recommendations.

¶ 22    Following the hearing, the trial court presented a lengthy oral ruling, accompanied soon thereafter by a detailed written decision, addressing allocation of parenting time, allocation of decision-making, and Amber's petition for relocation. At the outset, the court noted for the record that it had reviewed everything presented, including the pleadings, prior court orders, expert witness reports, trial exhibits, photographs, and the applicable statutes, and that if it did not refer to some piece of evidence specifically, that did not mean it had not considered it. The court also made clear that it found both parties to be "wonderful and loving parents,"

and it was its belief that, when they married, which occurred quickly after they met and experienced an unplanned pregnancy, they were "living in two different states" and they "just didn't know each other"; Amber "never understood" John's commitment to remain in Illinois and practice law, and John "never understood" Amber's attachment to Colorado and her family. After viewing their testimonies, the court noted that it was "not sure [it] had the full story" from Amber regarding her original intention when she went to Colorado with the twins in May 2018, and similarly, it "was not sure" with respect to John's intention when he moved his boat to Colorado during that same time and pursued legal licensure there. In any event, it found both parties credible with positive demeanors while testifying but "somewhat evasive in their communications with each other," which led to the cause being a "complex and difficult" one to resolve. The court further found Amber's lay witness Jolly and John's lay witness Augustine to be credible, and Dr. Ravitz to be "very credible," Dr. Kraus to be "credible and straightforward," and GAL Kuzniar to be "very credible" and that she had "conducted a thorough investigation and showed a fabulous demeanor on the witness stand."

¶ 23     After these preliminary comments, the court turned to the three issues presented. First, it addressed each of the 15 statutory factors regarding allocation of decision-making contained in section 602.5(c) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/602.5(c) (West 2018)), and after its analysis, found they favored Amber and, thus, it allocated sole decision-making to her over the twins' medical and educational matters. Next, the court addressed each of the 17 statutory factors regarding allocation of parenting time contained in section 602.7(b) of the Act (750 ILCS 5/602.7(b) (West 2018)), and after its

analysis, found they favored Amber; it then issued a detailed breakdown of the parties' awarded parenting time in accordance with its decision.

¶ 24     Finally, and at issue in the instant cause, the trial court addressed each of the 11 factors regarding relocation contained in section 609.2(g) of the Act (750 ILCS 5/609.2(g) (West 2018)) and, after its analysis, granted Amber's petition to relocate the twins to Colorado. Before doing so, it commented on two initial matters: prior litigation and statutory notice requirements. First, it discussed the prior trial court orders of March 2019 (the UCCJEA jurisdictional finding that the twins' home state was Illinois) and September 2020 (the *sua sponte* two-week on/off schedule implemented while custody litigation was pending). The court noted that with respect to the latter, and up until that point, "the children's primary residence was always with [Amber], wherever she was located"; with respect to the former, it concurred with the previous trial court and similarly concluded that "the children lived in a multi-state existence throughout their lives and have continued to do so." It reasoned that the home state order "was issued for adjudication of jurisdictional issues" only, and Illinois was properly chosen because, since the children has not resided in either state for six months prior to the filing of the divorce petition, and given that John had filed first and did so in Illinois, it was reasonable for Illinois to assert jurisdiction over the twins. Second, the court noted that Amber had properly filed her petition for relocation, even though she had not technically complied with section 609.2's statutory written notice requirement before doing so. The court stated that Amber "has continuously exercised either the majority of parenting time, or, since the September 2020 order of Court, no less than equal parenting time." The court found that because of this, and in addition to "the specific and unique facts presented," the written

18

notice requirement "does not fit here[, a]nd to the extent that provision is applicable, any failure to satisfy it does not preclude [Amber from] obtaining relief from this Court." It further specified that it could not, nor did not, find her proposed "relocation" was without good cause or done in bad faith, particularly since she had maintained a home in Colorado since 2006, long before, as well as throughout the entirety of, the parties' marriage.

¶ 25        In turning to the statutory relocation factors, the court began by stating that "the present matter is not strictly speaking a relocation case" in that the "unique facts specific to the parties' residences and their children's lives present an unusual hybrid case." The court found that the first factor (see 750 ILCS 5/609.2(g)(1) (West 2018)), reasons for intended relocation, favored Amber, as her "support system, improved environment and happiness" as "the long-term primary caretaker" of the twins comprised "meaningful reasons for [her] intent to rear the children in Colorado," in accordance with Dr. Ravitz's testimony. The second factor of a good faith objection to relocation favored John, as the court believed he "genuinely fears his relationship will be impacted." See 750 ILCS 5/609.2(g)(2) (West 2018). The court found the third factor slightly favored Amber; she had "the deepest history and quality relationship with the children and has been their primary caregiver, teacher and nurturer," but John has developed a relationship with them as well, especially since the two-week on/off court order of which he has taken full advantage. See 750 ILCS 5/609.2(g)(3) (West 2018). Factors four and five both favored Amber; the court noted schools in either area would be appropriate for the children, but it heard more regarding a specific Colorado school's curriculum with a calendar more amenable to the parenting time it would be allotting than the general school testimony regarding La Grange schools, and similarly, while

both parties provided extended families for the twins, Amber's in Colorado (particularly her parents) was and has been more involved with the children. See 750 ILCS 5/609.2(g)(4)-(5) (West 2018). The court found the sixth factor, the anticipated impact of relocation on the twins, to be neutral. See 750 ILCS 5/609.2(g)(6) (West 2018). In discussing this factor, the court repeated Dr. Ravitz's finding that the twins "have lived in Colorado for all of their conscious lives." It commented that the children "only know their multi-state existence with their mother and their father" and it did not "see that changing." It acknowledged that awarding Amber primary custody would necessarily impact the time the twins spent with their father and its frequency, but noted that this did not equate to a negative impact on their relationship. Factor seven, regarding the ability to fashion a reasonable allocation of parenting time and decision-making in light of relocation, slightly favored Amber, as the court had already evaluated these in Amber's favor within the other portions of its decision. See 750 ILCS 5/609.2(g)(7) (West 2018). The court further found that while factor eight regarding the children's wishes did not apply, factor nine also slightly favored Amber, as while both parties have been able to afford and cooperate regarding the inherent travel required here, Amber still had the best primary childcare plan, given her parents' assistance in this. See 750 ILCS 5/609.2(g)(8)-(9) (West 2018). The court found the tenth factor to be neutral or slightly favored John; it acknowledged that, regardless of where the twins lived, there would be a disruption to their relationship with the other parent, but one which the parties have already attempted to alleviate "with a robust schedule of daily Skype contact ***, something that the children have known throughout their conscious lives as normative." See 750 ILCS 5/609.2(g)(10) (West 2018). Finally, in addressing the eleventh factor's catch-

all provision, the court declared that Amber's "role as the consistent, lengthy, primary caretaker is vital to this Court's determination" and found that, "given the evidence adduced at trial," primary residency with John in Illinois would be "traumatic" for the twins. See 750 ILCS 5/609.2(g)(11) (West 2018).

¶ 26 Lastly in its decision, the court wished to clarify that under the relocation statute, the terms "primary residence" and "home state" have "a substantive legal distinction" and "refer to different concepts and imply different or distinct analyses," a point Amber argued during the proceedings but John disputed. The court reiterated that, accordingly, while the prior March 2019 court order correctly found Illinois to be the twins' home state for jurisdictional purposes, that did not compel it to now conclude that Illinois was also their primary residence. Rather, the court was required to conduct "a review of the relocation factors" pursuant to statute, which it did and which "compels the conclusion that residency in Colorado with [Amber] is proper."

¶ 27                                      ANALYSIS

¶ 28 On appeal, John first contends that the trial court erred in failing to regard the instant cause as a relocation matter pursuant to section 609.2 of the Act and that, via various missteps in interpreting the statute, impermissibly shifted the burden of proof to him. He then contends that, even were this not the case, the court erred in weighing the evidence at trial and granting Amber's petition to relocate the children to Colorado. We disagree.

¶ 29 As a threshold matter, the parties dispute the applicable standard of review. John argues that the trial court "effectively failed to apply the standards set forth in Section 609.2" and did not handle this as a true relocation case because it only "facially" mentioned the statutory

factors and "briefly summarized" them without considering them. He states that in light of this, the court did not apply the statute and instead reduced this to a best interests analysis, thereby committing an error of law which requires *de novo* review. Later in his brief, however, and perhaps as an alternative argument, John seemingly admits the court did consider the statutory relocation factors, but argues that its ultimate decision regarding them was against the manifest weight of the evidence. Amber, meanwhile, avers that a trial court's decision regarding relocation is to be reviewed pursuant to a manifest weight of the evidence standard.

¶ 30    John's advocacy for *de novo* review is a difficult one to understand, especially in light of the trial court's lengthy decision in this matter. We are baffled by his assertion that the court only "facially" mentioned the statutory factors or simply summarized them without applying or considering them. The record belies such an assertion. Unmistakably, and undeniably, the trial court examined every applicable statutory factor and applied the facts presented to each of them, with explicitly detailed care, both in its oral colloquy and then again in its written decision. We have, at length herein, noted as much, and John admits that the court examined the factors later in his brief on appeal (albeit to his disapproval).

¶ 31    We also do not quite understand John's repeated claim that the trial court, somehow impermissibly or incorrectly, reduced this relocation matter to a best interests analysis, thereby shifting the burden to him and, again, requiring *de novo* review. Contrary to his intimations that the court "abandoned any relocation analysis and made its[ ] finding strictly a best interest analysis," we note that, even were this true, which the record demonstrably disproves, the consideration of a child's best interests is part and parcel of section 609.2

governing relocation. Indeed, the very subsection that lists the relocation factors at issue introduces those factors by first stating that, when determining the propriety of a relocation request, "[t]he court shall modify the parenting plan or allocation judgment *in accordance with the child's best interests*." (Emphasis added.) 750 ILCS 5/609.2(g) (West 2018); see *In re Marriage of Kimberly R.*, 2021 IL App (1st) 201405, ¶ 74. In addition, our supreme court has spoken directly to this point and declared that "[i]n adjudicating a relocation petition [filed under section 609.2(g) of the Act], a trial court's paramount consideration is the best interests of the children." *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32. We will discuss this more below, but at this juncture, we certainly do not see how the trial court's consideration of the twins' best interests when deciding Amber's relocation petition, which is authorized, and even demanded, by the relocation statute at issue, would be considered an abrogation or misapplication of the law requiring *de novo* review on appeal.

¶ 32     Our point here is this: we are not persuaded by John's assertion that we are to apply *de novo* review to the instant matter, and we find no reason to depart from our well-established case law holding the exact opposite to be true.

¶ 33     That is, precisely because the adjudication of a relocation petition inherently requires a best interests determination, reviewing courts should not reverse a lower court's decision with respect to such petitions " 'unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred.' " *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 75 (quoting *Fatkin*, 2019 IL 123602, ¶ 32) (this is the standard applicable to determinations involving a child's best interests and relocation petitions, as the latter necessarily involves the former). " 'The trial court's decision is against the manifest weight

of the evidence only if the evidence "clearly" calls for a conclusion opposite to that reached by the trial court or only if the factual findings on which the decision depends are clearly, plainly, and indisputably erroneous.' " *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 75 (quoting *In re Parentage of P.D.*, 2017 IL App (2d) 170355, ¶ 18). It is this standard, with its marked deference, that is appropriate for the review of relocation matters "because it recognizes that the trial court, as the trier of fact, had a superior opportunity 'to observe both parents and the child[ren] and, thus, is able to assess and evaluate their temperaments, personalities, and capabilities.' " *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 75 (quoting *Fatkin*, 2019 IL 123602, ¶ 32). As such, and significantly, " ' "[t]he presumption in favor of the result reached by the trial court is always strong and compelling in this type of case." ' " *Fatkin*, 2019 IL 123602, ¶ 32 (quoting *In re Marriage of Eckert*, 119 Ill. 2d 316, 330 (1988), quoting *Gallagher v. Gallagher*, 60 Ill. App. 3d 26, 31-32 (1978)); accord *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 75 (such considerations dominate the review of relocation matters).

¶ 34                              I. Case Treatment and Burden of Proof

¶ 35        With this standard of review in mind, we turn to John's initial contention on appeal, which overarchingly asserts that the trial court's mistreatment of the cause impermissibly shifted the burden of proof to him as the nonpetitioning party to prove that the twins should remain in Illinois. First, he takes issue with the court's description of the cause as a "non-traditional" relocation matter and its finding that the children had resided in Colorado "all of their conscious lives," concepts he insists do not exist as relocation considerations under section 609.2. He concludes that the court's use of these terms "clearly shows that [it] did not treat this as a relocation case nor apply the applicable statute" and that it abandoned any

24

relocation analysis it was called upon to provide. Second, John takes issue with the court's finding that the twins' primary residence was always with Amber, wherever she was, rather than Illinois. He insists that this conclusion shows the court completely disregarded both the fact that Amber's filing of the petition to relocate was a legal admission that the twins' "primary residence was and continued to be Illinois," and the prior March 2019 order finding the twins' home state to be Illinois, a holding from which, he claims, it "[l]ogically" "should follow" that their primary residence is also Illinois. Based on the record before us, we find that John mischaracterizes the court's decision and there is no merit to his assertions.

¶ 36     We begin by noting John is correct that the burden in the cause was, and always remained, with Amber. Pursuant to the relocation statute, the burden rests with the parent desiring to relocate to prove that relocation is in the best interests of the children, as measured by the factors set forth in section 609.2(g). See *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 78 (citing *In re Marriage of Levites*, 2021 IL App (2d) 200552, ¶ 57). Accordingly, then, Amber, as the petitioner, had the burden of production, namely, to produce evidence on the twins' best interests, as well as the burden of persuasion, namely, to convince the court that it was in those best interests to relocate them to Colorado according to the statutory factors. See *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 78 (citing *Levites*, 2021 IL App (2d) 200552, ¶ 61); see also *P.D.*, 2017 IL App (2d) 170355, ¶ 15 ("The parent seeking removal has the burden of proving, by a preponderance of the evidence, that removal would be in the child's best interest."); accord *Eckert*, 119 Ill. 2d at 325.

¶ 37    This, however, is where our agreement with John ends, as we do not find, and John fails to adequately demonstrate, that the trial court impermissibly shifted the burden to him in its treatment of this cause.

¶ 38    First, contrary to John's insistence, we find no issue with the court's comments that this was a "non-traditional" relocation case. Having reviewed the facts presented, we could easily agree with the court in this respect. As it noted, this was not the typical case where two parents live in one state and, upon the end of their union, one of them seeks to relocate to a new state with the children. Rather, the trial court here found that the parties consistently maintained a multistate relationship—long before their marriage, throughout its entirety, and after the birth of the twins. This made the case unusual and unique from the start. The record shows that when the parties met in 2016, John was living in Illinois, and Amber was living in Texas; she was living there in temporary housing due to her employment, and she was simultaneously maintaining her Colorado property, which she had already owned for some 10 years. In reviewing the parties' relationship history, the court commented that it was not sure it got "the full story" on Amber's intentions about living in Illinois; some facts indicated she had a relationship to Illinois, such as her signing the apartment lease and extending it, but it could not be denied that other facts indicated the opposite, such as her never holding an Illinois driver's license, never filing an Illinois tax return, never voting in Illinois, and essentially splitting her time between the two states. Moreover, the court found that just as unclear as Amber's intentions were, so too were John's about living in Colorado; he worked and owned property in Illinois, but he filed tax returns in Colorado, baptized his children there, drove and stored his boat at Amber's Colorado home, where he also performed

26

significant landscaping, applied for the twins' passports listing Colorado as their permanent residence, and applied for, tested for, and received a license in Colorado to practice law.

¶ 39    Additionally, once the twins were born, it was not as if the parties settled down in either state. To the contrary, as the trial court found, the twins themselves lived a multistate existence as much as Amber and John did. The moment they were medically cleared from the hospital NICU, they took their first trip to Colorado. Trips and time spent in Colorado thereafter, as detailed by the trial court, are, suffice to say, too numerous and voluminous to repeat here. They essentially split their time in both states beginning at four months old. The twins were even enrolled and attended two separate preschools, one in Colorado and one in Illinois, at the same time. In line with the trial court's evaluation, we are hard-pressed to conclude that the parties' situation was anything but nontraditional within the context of relocation. Indeed, this was not a case which involved a "move," as traditionally defined, of the twins from Illinois to Colorado. This was because a multistate relationship between Illinois and Colorado was the parties', and the twins', reality. We do not believe this can plausibly be denied, and contrary to John's claim, there is certainly more than enough evidence in the record to support the court's conclusion.

¶ 40    More importantly, we fail to see how the court's comment that this was a nontraditional relocation case somehow evidences a dereliction of its duty to consider the statutory factors of section 609.2 or an improper shift of the burden of proof from Amber to John. Again, as proven by its oral and written decisions, both more detailed and thorough than this Court is used to seeing, the trial court most certainly did no such thing. In fact, the trial court specifically noted that precisely because this was "not strictly speaking a relocation case,"

27

but rather, "an unusual hybrid case" due to "the unique facts specific to the parties' residences and their children's lives," its review and ultimate decision "warrant[ed] an examination of all potentially applicable statutory provisions of the [Act]." The record then shows the court clearly conducted such an examination, particularly the factors in section 609.2(g), when discussing relocation. Moreover, we note that this trial court was not the only to comment on the nontraditional nature of this matter. GAL Kuzniar's own comments reflected the same when she testified that this cause was "more complex than simple relocation," since "the parties resided in two different states, and the children traveled from state to state"; experts Drs. Ravitz and Kraus expressed similar sentiments. Additionally, when the parties first appeared for the March 2019 jurisdictional analysis, the trial court, which was called upon to determine the twins' home state, likewise declared that this matter was "much more involved" than a typical relocation case, as it was "truly one of the parties sharing a multi-state relationship." Because of this, that court, just as the instant trial court, stated it needed to turn to an examination of all the unusual facts pertaining to the lives of the children before rendering its decision. What proves quite interesting to us in this respect is that John takes no issue on appeal with that prior court's commentary recognizing the nontraditional nature of this case when he describes its holding—a holding that found the twins' home state to be Illinois, and a holding which, undoubtedly, favored John. It was only when the instant trial court issued its decision granting Amber's relocation petition, a decision unfavorable to him, that he asserts error regarding essentially the same comment—one the record otherwise supports and one that, without more, we cannot conclude had the consequence of inappropriately shifting the burden from Amber to him, as he claims.

28

¶ 41      We find the same to be true of the other phrase the trial court used in its oral and written decisions that John takes issue with, that is, that the twins had lived in Colorado "all of their conscious lives." John asserts that not only was it improper for the court to deviate from the statute by considering such a "vague personal and not scientific concept," but also there was "no testimony" regarding this and the court necessarily "created its own statutory exception." However, John mischaracterizes the record, and again, we do not find the court's comment to have improperly shifted the burden here. First, there was, indeed, testimony and evidence about the concept of the twins' "conscious lives." This came directly from Dr. Ravitz, the expert appointed specifically by the trial court to assist in its evaluation of the relocation petition. Dr. Ravitz visited and interviewed the parties, prepared a written report, and subsequently testified, as directed by the court, which found him to be "very credible." Dr. Ravitz was frank in his finding that there was no real difference between the twins growing up in Illinois versus Colorado when it came to their general educational, social, and extracurricular opportunities. He also noted that both parties were competent and adequate parents who were not being manipulative but, rather, just differed as to where they wanted to reside. As such, a decision had to be made about where the twins should live. He explained that, with everything else about the same, he looked at the cause from a "forensic mental health standpoint," evaluating the twins' lives in Chicago, where they were more physically present from their births until about 18 months, as distinguished from their lives in Colorado, where they were more physically present from May 2018 (the time of divorce) until June 2020 (when he wrote his report). From this, Dr. Ravitz concluded that the twins' "primary home for all their conscious lives" was Colorado, lives that were, up to this point, certainly

short, but at four years old and having built a community of relationships and activities, had become markedly different than when they were infants in Chicago.

¶ 42      Again, we fail to see how Dr. Ravitz's comment about "conscious lives," and the trial court's reference to it, shows the court did not treat this as a relocation case, failed to apply the applicable statute, or abandoned any relocation analysis, as John maintains. Section 604.10(b) of the Act states that a trial court "may seek the advice of any professional, whether or not regularly employed by the court, to assist the court in determining the child's best interests," and his report is to contain, in part, "any recommendations of the professional concerning *** the child's relocation" and "an explanation *** regarding the resulting recommendations." 750 ILCS 5/604.10(b) (West 2018). Following the statute, the court employed Dr. Ravitz in this role, and Dr. Ravitz complied, describing the considerations he used when forming his opinion. The court, having found Dr. Ravitz "very credible" when testifying as to his report, had every right to rely on his testimony. See *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 75 (witness credibility determinations in relocation petition hearings lie solely within province of trial court).

¶ 43      Also, and again pursuant to statute, section 609.2(g)(11) states that, in addition to the listed statutory factors to be used when considering the propriety of relocation, the trial court may also consider "any other relevant factors bearing on the child's best interests." 750 ILCS 5/609.2(g)(11) (West 2018). The concept of "conscious lives," as explained by Dr. Ravitz, was a factor both applicable to the twins here and relevant to his opinion. While "conscious lives" is not a statutory term, that the court considered the concept, as testified to by its own expert, which it was allowed to do in accordance with the statute, does not amount to error.

Moreover, the court mentioned this concept only briefly. In its oral decision, it stated that it "like[d]" the concept of "conscious lives" as it meant "since you've had memory, since you're fully aware of what's happening." The twins' memories and awareness of their surroundings certainly classify as a relevant factor bearing on their best interests. In its written decision, the court referred to their "conscious lives" in relation only to the statutory factor of anticipated impact of relocation on the twins, finding that while it would necessarily impact the frequency of time they spent with John, that did not equate to a negative impact on their relationship. It was not as if the trial court relied solely on the concept of "conscious lives" in rendering its decision. As the ultimate benchmark was, and always remained, the twins' best interests, and as the relocation statute allows the trial court to consider "any other relevant factor bearing" thereon, we find no impropriety in the court's repetition of a consideration used by its appointed expert witness, whom, again, it found to be very credible.

¶ 44        John's final claim in relation to his assertion that the trial court's mistreatment of this cause resulted in inappropriate burden-shifting lies in his assertion that the court inappropriately determined the twins' primary residence to have always been with Amber, wherever she was. John states this finding demonstrates the court disregarded the inherent admission in Amber's petition that their primary residence was Illinois and the prior trial court's March 2019 order finding the twins' home state to be Illinois. Again, we find no merit to John's claim.

¶ 45        Simply put, the trial court's finding that the twins' primary residence has always been with Amber, wherever she was, was proper and supported by the evidence. We understand John's assertion that by the mere filing of the relocation petition, Amber technically made a

31

legal admission that the twins' primary residence was Illinois. This is, after all, the essence of such a petition—asking for the relocation of children from their primary residence—and it inherently requires the petitioner to make an admission. However, in this cause, this is a matter of form over substance that has no real applicability to the unique circumstances here. We have already discussed at length that this was not a traditional relocation case. No expert who testified, and no court involved in this matter, ever viewed it as such. So, the fact that Amber's petition technically made a legal admission that the twins' primary residence was Illinois is, in our view, of no real consequence. Instead, what is more critical to us is the evidence presented as to the statutory relocation factors and the children's best interests and whether it supports the trial court's ultimate decision to grant relocation. In that respect, as the record shows, all three expert witnesses—court-appointed expert Dr. Ravitz, GAL Kuzniar, and John's own retained expert Dr. Kraus—testified that not only did they each, separately, determine that Amber was the twins' primary caregiver, but also that John admitted, to each of them separately, this to be true. The court took into account that this somewhat changed later when the two-week on/off visitation schedule was instituted during the divorce proceedings, but it could not deny that the twins "were with their mother primarily, most of the time" since they were born. In contrast to John's assertion, we do not believe Amber's mere filing of her petition to relocate the twins legally bound the court to issue a holding that Illinois was the twins' primary residence without any consideration of the evidence before it, evidence that in this unique case clearly contradicts such a finding.

¶ 46    Finally, we disagree with John that the trial court's finding that the twins' primary residence was always with Amber somehow ignored or violated the prior trial court's order

32

of March 2019 that declared the twins' home state to be Illinois. John's insistence that a primary residency finding of Illinois must, or logically should, follow from a home state determination of Illinois is legally incorrect. Rather, John conflates the two concepts, which are clearly not the same. As the record demonstrates, since John was the first to file for divorce (which he did in Illinois), and since the twins were living with Amber in Colorado at the time, the trial court in Illinois needed to determine if it had jurisdiction over the twins pursuant to the UCCJEA. What made it difficult for that court was that the UCCJEA defines a child's home state as the state in which he has lived "for at least six consecutive months immediately before the commencement of a child-custody proceeding." 750 ILCS 36/102(7) (West 2018). Noting "[t]he reality is that the children did not live in either Illinois or Colorado continuously for [a] six[-]month period immediately prior to" the institution of the divorce proceedings, that court looked to other factors, such as the twins' connection to Illinois and the fact that John filed first, in order to find their home state to be Illinois.

¶ 47    However, this determination was under the UCCJEA and for jurisdictional purposes only. The UCCJEA home state analysis " 'was promulgated to end custody jurisdictional disputes between states' " and is undertaken to determine what court has subject matter jurisdiction over a child in dissolution of marriage proceedings when more than one state is involved. *Fleckles v. Diamond*, 2015 IL App (2d) 141229, ¶ 32 (quoting *In re Joseph V.D.*, 373 Ill. App. 3d 559, 561 (2007)). Once a determination regarding subject matter jurisdiction is made under the UCCJEA, that statute gives that court continuing jurisdiction, which is " 'simply a procedural limit on when the court may hear initial custody matters.' " *In re Marriage of Milne*, 2018 IL App (2d) 180091, ¶ 27 (quoting *McCormick v. Robertson*, 2015 IL 118230,

¶ 27). Considerations regarding home state determinations include topics like the child's "habitual residence" (as defined by the UCCJEA), the timing of the commencement of the action, and the child's connection to and temporary absence from a certain jurisdiction. See *Milne*, 2018 IL App (2d) 180091, ¶¶ 27-30.

¶ 48    Primary residency under the Act, meanwhile, is an entirely different legal concept under an entirely different statute. When the instant trial court made its ruling as to the twins' primary residence being Colorado three years later in June 2022, it was no longer dealing with jurisdiction, which, again, had long been determined by the prior court in March 2019. Rather, it was dealing with relocation concerns and, of course, a best interests analysis, under the Act. At issue now was the substance of the parties' dispute, not the state in which the dispute was to be decided. That Illinois was determined to be the twins' home state for jurisdictional purposes in dealing with the dissolution petition but Colorado was determined to be their primary residence after a best interests determination related to the statutory relocation factors was not inappropriate because the former is not dispositive of the latter. They are, instead, legal concepts with substantively different distinctions.

¶ 49    Moreover, and once again contrary to John's insistence, the record shows that the instant trial court in no way ignored the prior court's March 2019 order. Instead, it mentioned it several times in its decision and, as we have here, noted the difference between that court's findings within the context of a procedural home state jurisdictional analysis at the start of this litigation and the substantive primary residence review in the context of relocation and best interests at the end of this litigation. It further noted that section 609.2(h) of the relocation statute refers to both "home state" and "primary residence" and uses them

differently, further indicating that they are different legal concepts. See 750 ILCS 5/609.2(h) (West 2018). From this, the instant trial court concluded that while the prior order was correct in asserting Illinois to be the twins' home state jurisdiction, it "did not compel a conclusion that the children's primary residence was in Illinois." John provides us with no legal precedent, and we find none, to mandate that a determination of primary residence must "follow" from a determination of home state. Our statutory scheme makes clear that these are not one in the same.

¶ 50 Ultimately, and regardless of all this, the trial court's comment that the twins' primary residence was always with Amber, wherever she was, along with the comments we have analyzed here that John takes issue with, are just that: comments. The crux of the trial court's decision was its examination of the relocation factors of section 609.2(g) of the Act. That is where our focus now turns in order to determine whether the court's grant of Amber's petition to relocate the twins based on those factors was against the manifest weight of the evidence.

¶ 51                              II. Statutory Relocation Factors

¶ 52 John's final contention on review is that the trial court "misapplied" the section 609.2(g) relocation factors and thereby erroneously granted Amber's petition to relocate the twins to Colorado. First, he insists that the court refused to apply the notice requirements of section 609.2(d) (see 750 ILCS 5/609.2(d) (West 2018)) and instead simply declared that Amber "relocated with good cause." He then claims the court erred in weighing certain factors it found to be in Amber's favor. Based on the record, we do not find that the trial court's grant of Amber's relocation petition was against the manifest weight of the evidence.

¶ 53    Briefly, with respect to notice, John again mischaracterizes the record. As the trial court noted, section 609.2(d) of the relocation statute has a written notice requirement, stating that the relocating parent "must provide at least 60 days' written notice before the relocation unless such notice is impracticable," and this notice must contain the intended date of the parent's relocation, the address of the intended new residence if known, and the length of time relocation will last if it is not for an indefinite or permanent period. 750 ILCS 5/609.2(d) (West 2018). Section 609.2(d) further states that a court "may consider a parent's failure to comply with the notice requirements of this Section without good cause *** as a factor in determining whether the parent's relocation is in good faith." 750 ILCS 5/609.2(d) (West 2018).

¶ 54    The trial court here did not refuse to consider the notice requirement and simply declare Amber had relocated with good cause, as John insists. Rather, it spent quite a bit of time, particularly in its oral decision, discussing its applicability to this case and how it weighed Amber's technical violation of it in relation to the other factors involved. The court initially explained it did not believe the requirement applied here because it did not "fit[ ] the history of this case" due to this family's multistate relationship and their residency. This is more than understandable and supported by the record. In addition to the unique relationship, John knew Amber was taking the twins to stay in Colorado the day they left in May 2018, he knew where exactly they would be staying, and there was no particular day planned for their return; he testified that he planned to call them whenever the Willard Street construction was complete. As the trial court noted, the evidence suggested that Amber herself may not have even known when she left for Colorado that day in May 2018 that she and the twins would

36

relocate there and not return, which did not come to light until later, in June/July 2018. While John's expert Dr. Kraus believed there was an appearance of deception on Amber's part, Dr. Ravitz and GAL Kuzniar explicitly disagreed. Accordingly, there was no error in the court's reasoned conclusion that the statutory notice requirement did not apply.

¶ 55   Moreover, the court noted that, even if it were to conclude that it applied, it may, per the latter portion of the notice section, consider Amber's failure to comply as a factor in determining whether her relocation was in good faith. Citing Amber's maintenance of her Colorado home for over a decade, her support system there, and the home environment for the twins in that location, it concluded that it "could not find her move to be without good cause or in bad faith." Again, we find no error in the court's determination. According to the statute, the only consequence for failing to comply with the notice requirement for relocation is that the trial court "may consider" that failure as a factor in determining whether the parent's relocation "is in good faith." 750 ILCS 5/609.2(d) (West 2018). It is not, contrary to any intimation from John, an automatic denial of a relocation petition or a preclusion from obtaining relief. The record shows the trial court followed section 609.2(d). It acknowledged Amber's failure to comply, considered it as a factor, and ultimately found that it did not show a lack of good faith. There is nothing more to say on this point.

¶ 56   We have finally reached the statutory relocation factors of section 609.2(g), of which there are 11. On appeal, however, John asserts error with respect to only five of them: factors (1) the circumstances and reasons for relocation, (3) the history and quality of each parent's relationship with the children, (4) educational opportunities, (5) the presence or absence of

extended family at the existing and proposed locations, and (7) whether the court will be able to fashion a reasonable allocation of parental responsibilities if relocation occurs.

¶ 57    Our supreme court has made clear that relocation determinations " 'cannot be reduced to a simple bright-line test.' " *Fatkin*, 2019 IL 123602, ¶ 32 (quoting *Eckert*, 119 Ill. 2d at 326). Rather, because the children's best interests are involved, they " 'must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case.' " *Fatkin*, 2019 IL 123602, ¶ 32 (quoting *Eckert*, 119 Ill. 2d at 326); accord *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 74. Thus, as the unique facts of each relocation case dominate it, comparisons to other relocation cases are of little value. See *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 74 (citing *Levites*, 2021 IL App (2d) 200552, ¶ 71). Ultimately, the determination of a relocation petition

> " 'cannot be reduced to a simple tally of which party "won" a majority of the enumerated factors; instead, because some factors in a particular case may weigh more heavily than others, the trial court must consider all factors and evidence touching on the issue and must arrive at a reasonable result.' " *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 74 (quoting *Levites*, 2021 IL App (2d) 200552, ¶ 71).

¶ 58    With respect to factor (1), circumstances and reasons for relocation (see 750 ILCS 5/609.2(g)(1) (West 2018)), the court found that this favored Amber because, in addition to its belief she had not relocated in bad faith, the support system, improved environment, and Amber's psychological well-being supported that conclusion. The trial court observed that, based on the testimony, particularly that of GAL Kuzniar and Dr. Ravitz, the evidenced demonstrated the twins enjoyed a better support system and a healthier environment with

38

their grandparents and pets in Colorado, and Amber's well-being, which trickled down to them, was also improved in Colorado. We recognize John's view that the court's determination can be seen by some to "encourage" a parent to relocate with the children without asking permission and then seek forgiveness after the fact, while rewarding her with custody. However, as the record demonstrates, that is hardly what the trial court did here in evaluating this factor. It did not simply state that because Amber was in Colorado with the twins, the twins should relocate there. We have stressed this throughout our decision: the trial court conducted a thorough analysis of the cause before it, in accordance with the applicable statute. Again, that cannot be denied, and based on the record, we cannot say that the evidence presented regarding the reason for relocation does not support the court's finding as to this factor.

¶ 59    John next challenges factor (3), the history and quality of each parent's relationship with the children and, specifically, whether a parent has substantially failed or refused to exercise parental responsibilities allocated to him under the parenting plan or allocation judgment. See 750 ILCS 5/609.2(g)(3) (West 2018). John claims the trial court weighed this factor based only on Amber's unilateral decision to remove the twins from Illinois and did not consider that he sought their return long before the court's order. That is not the case. The court found this factor only slightly favored Amber. It praised John repeatedly for exercising his parenting time and for developing a relationship with the twins once the two-week on/off schedule was instituted. It also knew the procedural posture of the case from its inception, including all the motions John had filed. However, it found that Amber had the deeper history and quality relationship with the twins, as she had been their primary caregiver since

birth. Again, the evidence supported this conclusion. All three expert witnesses, even John's own, testified that this was the case and that John himself admitted as much to each of them. John also testified before the trial court that Amber had cared for the twins "pretty much exclusively." As the court accurately relied on the evidence, we cannot say its conclusion was erroneous.

¶ 60    With respect to factor (4), educational opportunities (see 750 ILCS 5/609.2(g)(4) (West 2018)), John claims the court erred in finding this weighed in Amber's favor because she presented an "absence of meaningful testimony regarding the educational opportunities which would be presented should relocation be granted." He cites the fact that GAL Kuzniar and Dr. Ravitz did not personally investigate the schools in either La Grange or Colorado, that Amber's witness (Colorado school director Jolly) had never met the twins, and that his witness (Augustine) distinctly testified as to her "direct firsthand accounts, interactions, and opportunities actually afforded to [her] children who attended schools in La Grange." The record, however, directly counters John and demonstrates not only that Amber did present "meaningful testimony" on this subject, but also that the court spent much time considering this factor, perhaps more than any other. First, even though GAL Kuzniar and Dr. Ravitz did not investigate schools in either area *per se*, the twins were not even school-age at the time of their reports. With respect to educational opportunities, however, they both testified, as did John's own expert Dr. Kraus, that schools in both areas were appropriate; Dr. Ravitz stated there was no difference between them, Dr. Kraus considered any differences to be "a wash," and GAL Kuzniar stated the same, with the caveat being that Amber was providing more educational opportunities at the time because she had transformed her home in Colorado into

a Montessori-teaching setting, while John, in La Grange, had not done anything comparable. Additionally, the trial court recognized that schools in both areas were highly ranked and had received awards. While Augustine testified, credibly as per the court, as to her experiences with La Grange schools, we would note that, as John's sister and a La Grange village board trustee, she is considerably partial; also, we cannot say her children's experiences are entirely relevant, as the twins are younger than her children and have particular health concerns.

¶ 61    As the court discussed at length, it simply "heard more testimony regarding the Colorado school," particularly through the testimony of school director Jolly, as presented by Amber. Though he might not have yet met the twins in person at that time is of little consequence; again, they were not of age to even attend the school at that time. He was able, however, to directly testify as to the particular educational opportunities they would receive at the school, The Classical Academy, in which Amber would be seeking to enroll them when they were of age. He detailed its curriculum, philosophy, methodology, and other factors like class size and extracurriculars. Interestingly, there was no comparable evidence regarding any specific La Grange school. Additionally, the court took much time in discussing the different school district schedules, finding the Colorado school's to be more facilitative of the plan the court had fashioned with respect to the allocation of parenting time. Based on all this, the trial court's assessment of this factor was not against the manifest weight of the evidence.

¶ 62    John next claims that the court erred in finding that factor (5), the presence or absence of extended family at the existing location and the proposed location (see 750 ILCS 5/609.2(g)(5) (West 2018)), favored Amber because she failed in her burden of proof as to this consideration. John insists this is because Amber did not present testimony from

41

members of her extended family living near her in Colorado and neither GAL Kuzniar nor Dr. Ravitz investigated these relationships, while the court otherwise heard much live evidence regarding John's family's relationship with the twins, such as his sister's testimony. To the contrary, the trial court heard extensive testimony about the twins' maternal relatives and their strong connection to them, specifically, Amber's parents, siblings, and their children. For example, when Amber could not be present to care for the twins, they stayed with her parents in Colorado. This occurred not only after the divorce proceedings were instituted, but also during the marriage when the parties were a couple; instead of John caring for them, Amber would accompany the twins to Colorado and leave them with her parents before traveling to work events. There was also much testimony of, as the trial court noted, the twins' "extremely close relationship" with their maternal grandparents, the activities they enjoyed together, their frequency, and the twins' connection to their pets in Colorado, whereas John's parents were not with the children as often due to their ages and mobility issues. Based on this record, we cannot find that the trial court's determination was unsupported simply because Amber did not fly her family in to testify. Nor was the court's determination erroneous because GAL Kuzniar and Dr. Ravitz did not believe they needed to interview either family. They specifically noted that both parties were competent, responsible parents with familiar support systems and, thus, there was no need to do so, in their professional opinions. Again, the trial court found Amber, GAL Kuzniar and Dr. Ravitz to be credible witnesses. Without more, we cannot say its decision, based on their testimony and the evidence presented, was against the manifest weight of the evidence.

¶ 63    Finally, John argues that, in evaluating factor (7), of whether the court will be able to fashion a reasonable allocation of parental responsibilities between the parents if relocation occurs (see 750 ILCS 5/609.2(g)(7) (West 2018)), it did not compare the schedule it put forth to the current two-week on/off schedule in place pending litigation, which would result in John losing some 20% of his current parenting time. John's challenge is a misfire for several reasons. First, the trial court was keenly aware of the difference in the current schedule and the one which would result if relocation were granted. It commented on this many times in its decision. It also noted the reality of the situation, which we, too, cannot deny. That is, when the two-week on/off schedule was implemented, the children were not school-aged; when they were, they were attending preschool, which afforded this family the opportunity to enroll them in two different preschools in two different states at the same time, where they could attend each for two-week periods without affecting their academic careers. Years later, at the time of the instant decision, the twins were 5½ years old: kindergarteners. And, inherently, as time has continued to progress, so have they: this December, they will be turning seven, full-fledged first graders. Their academic careers are now underway, and it is no longer a viable option to split their schooling between two states on a biweekly basis; this will most certainly become more and more of a reality as time moves on. It is a concept that, simply, is no longer tenable.

¶ 64    Moreover, and even more significant, even presupposing, as John would have us, that Amber would return to Illinois should the grant of her relocation petition be reversed, none of the experts, not even John's own, Dr. Kraus, ever entertained the idea that John should have equal parenting time with the twins upon the determination of this matter. GAL Kuzniar

43

opined that John should not be given primary residency of the twins; she explicitly stated she would not support that idea nor an equal split in custody. Dr. Ravitz stated they should live in Colorado and have visits with John. And, Dr. Kraus specifically admitted that John should not receive equal parenting time *even if* Amber were to live with the twins in Illinois. In fact, Dr. Kraus went further to state John should have only alternating weekends and one weekday overnight each week with the twins, were they to live here. Accordingly, all three of the expert witnesses agreed John should receive something less than a 50/50 split of time he sought, regardless of where the twins were living. The two-week on/off schedule John refers to was, always and clearly, a temporary one only in place during this litigation. The trial court clearly considered it, and found it was no longer feasible or in the twins' best interests as they grow up. It cannot be denied that relocation will necessarily affect the amount of time a child will spend with one of his parents. The goal of this factor, however, is for the trial court to be able to establish a reasonable and realistic schedule, not a perfect one. See, *e.g.*, *In re Marriage of Eaton*, 269 Ill. App. 3d 507, 515 (1995). Based on the record, the trial court here did just that, and we find no error in its determination of this factor.

¶ 65    We find, contrary to any assertion, that the trial court here in no way simply reduced its section 609.2(g) factor analysis to a tally of which party "won" the most factors. Rather, we conclude, instead, that it clearly considered all the factors, as well as the evidence touching on each of them, and weighed all this properly. Its ultimate determination was more than adequately supported by the record, which it viewed first-hand, along with its observations of the parties' and their witnesses' testimony. As such, we cannot, and under these

44

circumstances of a total absence of any indication of manifest error will not, disturb its reasoned decision.

¶ 66                                    CONCLUSION

¶ 67        The trial court here was faced with a contested relocation petition arising from an incredibly unique, nontraditional, multistate living arrangement, one that existed since the birth of these children (and most certainly before). It conducted a detailed and expansive hearing at which both parties were given a full and fair opportunity to present evidence and testimony. At its conclusion, it entered an equally detailed and expansive 54-page oral and 16-page (mostly single-spaced) written decision describing its factual findings and its application of these to each of the relevant statutory factors. Only after taking everything presented before it into consideration did the court ultimately conclude that these "compel[ ] the conclusion that residency in Colorado with [Amber] is proper" for the twins.

¶ 68        It is obvious to anyone even cursorily glancing at the record in this matter that the parties—Amber and John equally—are wonderful parents who deeply love their children. Would that every child this Court encounters be in that same situation. And yet, this is what makes this cause all the more difficult. The trial court recognized it, and we do, as well. The parties, as is their right, have chosen not to live near each other upon their separation. However, their children, as is their right, are to reside in the location that is proven to be in their best interests in light of the applicable statutory factors. The trial court found that this comprised their relocation from Illinois to Colorado to live with Amber. There is no perfect solution inherent in relocation cases, which are markedly difficult, no matter the outcome. But the court's decision here was a perfectly reasonable one based on the record. Therefore,

and without more to overcome the " ' "always strong and compelling" ' " presumption in favor of the result reached by trial courts in relocation cases, we agree with its ultimate decision here. *Fatkin*, 2019 IL 123602, ¶ 32 (quoting *Eckert*, 119 Ill. 2d at 330, quoting *Gallagher*, 60 Ill. App. 3d at 32).

¶ 69      Accordingly, for all the foregoing reasons, we affirm the judgment of the trial court.

¶ 70      Affirmed.

---

***In re Marriage of Kenney*, 2023 IL App (1st) 221558**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2018-D-5945; the Hon. Debra Walker, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Matthew C. Arnoux, of Birnbaum, Gelfman, Sharma & Arnoux, LLC, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Myra A. Foutris, of Foutris Law Office, Ltd., of Chicago, for appellee. |

---