2025 IL App (1st) 250039-U

FIRST DIVISION
November 17, 2025

No. 1-25-0039

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| *In re* THE MATTER OF S.Y.: | ) | Appeal from the Circuit Court |
| RYAN YOUNG, | ) | of Cook County. |
| | ) | |
|     Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 2014 D 79049 |
| | ) | |
| BENE SIMS, | ) | The Honorable |
| | ) | D. Renne Jackson, |
|     Respondent-Appellee. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

*HELD*: Trial court's grant of appellee's petition to relocate affirmed, where it was supported by the record, the court properly applied all applicable statutory factors to the circumstances presented, and there was no manifest error in its determinations.

¶ 1 Petitioner-appellant Ryan Young (Ryan) appeals from a trial court order granting defendant-appellee Bene Sims' (Bene) petition to relocate the parties' minor child, S.Y., from Illinois to California. His sole contention on appeal is that the court's holding, based on

its evaluation of relevant statutory factors of section 609.2 of the Illinois Mariage and Dissolution of Marriage Act (Act) (750 ILCS 5/609.2 (West 2022)) governing relocation, was against the manifest weight of the evidence presented. He asks that we reverse the court's grant of the petition. For the record, Bene has not filed an appearance or a brief in this matter. We entered an order taking the case for consideration on the record and Ryan's brief only, and we proceed with our review accordingly, pursuant to *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976). For the following reasons, we affirm.

¶ 2                                        BACKGROUND

¶ 3        The record in this matter is voluminous and exhibits protracted and intense litigation between the parties, spanning over a decade. The majority involved myriad orders of protection and temporary restraining orders sought and received by both parties against each other over the years, as well as disputes over visitation, possession, and custody of S.Y. since her birth; she will soon be 12 years old. Again, this appeal involves only the trial court's grant of a petition for relocation, which was filed by Bene in October 2022. While the prior litigation is relevant, it is not our principal focus. Accordingly, we briefly summarize that background information and present in more detail those facts most pertinent to the court's relocation decision, as that is the only holding at issue in this appeal.[1]

¶ 4        The parties were in a relationship and living in Chicago when Bene became pregnant. They never married. S.Y. was born in December 2013.[2] At this time, Bene had a son from a

---

[1] Ryan presented a very thorough background of the prior litigation, detailing every instance of the parties' trial court appearances and the court's resulting orders, from February 2014 to April 2024.
[2] There is no dispute that Ryan is S.Y.'s biological father.

prior relationship who lived with her ex-partner in California, while Ryan, several years after his relationship with Bene ended and after S.Y. was born, had a daughter with a new partner living in the Chicago area. Thus, S.Y. currently has an older maternal half-brother in California and a younger paternal half-sister in Illinois.

¶ 5     The parties had a tumultuous relationship. Towards the end of her pregnancy with S.Y., Bene sought and received an order of protection against Ryan. However, upon S.Y.'s birth and before the order of protection expired, Bene allowed Ryan to be present at the hospital and went home with him to the parties' residence to live as a family. In mid-January 2014 when S.Y. was approximately two weeks old, Bene took her to California without informing Ryan. When Ryan located them, he filed emergency motions for S.Y.'s return to Illinois, temporary custody, and injunctive relief. The trial court granted these motions and declared Illinois to be S.Y.'s home state for jurisdictional purposes. It also ordered Bene to return and appear in court. Meanwhile, Bene filed a report of sexual abuse by Ryan toward S.Y. with the Department of Children and Family Services (DCFS); this was eventually ruled "unfounded."[3] The trial court entered orders declaring that Bene had absconded with S.Y. and directing law enforcement to compel her compliance with its orders of return home. Bene returned with S.Y. and filed an appearance in court. The parties agreed to share joint and physical custody and returned to living together in Chicago.

¶ 6     This did not last and the same pattern recurred. In May 2014, when S.Y. was five months old, the parties filed dueling orders of protection against each other. After hearings, Ryan

---

[3] For the record, Bene made a second DCFS report years later, alleging Ryan cut S.Y.'s hair inappropriately. DCFS ruled this report "unfounded," as well.

received temporary sole possession of S.Y. and Bene was awarded visitation. A 50/50 parenting schedule was later entered. By fall 2014, Bene made new accusations against Ryan, leading the trial court to order anger management for the parties, drug testing for Bene and alcohol treatment for Ryan, as well as adjusting visitation and parenting time over the next few years. In July 2017, Ryan returned to court alleging Bene again improperly removed S.Y. to California. This led to the court's entry of an Allocation Judgment and Parenting Plan, as agreed to by the parties. The judgment recognized both parties to be fit and proper parents and allocated 50/50 parenting time, holiday time, and equal decision-making responsibilities regarding S.Y., now four years old.

¶ 7        Time passed, but tensions, allegations, court hearings, and noncompliance with court orders continued. On February 8, 2022, Bene sent Ryan a text message informing him of her intent to relocate to California with S.Y. Ryan objected. Months passed and at some point, Bene again took S.Y., now eight years old, to California without notice or Ryan's consent. Bene informed Ryan that she was in California with S.Y. and that her son had been in a car accident. She eventually returned with S.Y.

¶ 8        In October 2022, Bene texted Ryan to inform him she had left Chicago for California with S.Y. so she could care for her son; she indicated this move would be permanent and her attorney would be contacting him. Ryan filed an emergency motion for return of S.Y. to Illinois. Bene returned with S.Y. and on October 25, 2022, she filed a formal notice and petition for relocation in the trial court. The court appointed a guardian *ad litem* (GAL) for S.Y. Over the next year, the GAL visited the parties and S.Y. in California and Chicago, spoke to witnesses, and submitted a report to the court.

¶ 9    The court held a hearing on Bene's petition to relocate, at which many witnesses testified.[4]  As expected, Bene and her witnesses testified as to why they believed S.Y. should relocate with her to California, and Ryan and his witnesses testified as to why they believed S.Y. should remain with him in Illinois.  Summarily, on Bene's behalf, her friend, Chanel Hawkins, testified that the parties have always had a "toxic" relationship and that Ryan is "controlling and aggressive."  She recounted that on the day of Bene's baby shower, Bene told her Ryan had punched her in the face; Hawkins saw bruising.  She often accompanied Bene to pick S.Y. up from her parenting time with Ryan, and S.Y. would say Ryan did not feed her.  Admittedly, Hawkins never saw Ryan behave aggressively toward S.Y.  Bene's twin sister, Germain Johnson, testified she and Bene were born and raised in California and moved to Illinois together.  Johnson married, and she and her husband introduced the parties; she later divorced her husband and moved back to California, where she currently resides. Johnson recounted instances during which she believed Ryan was controlling and/or abusive of Bene, and instances she believed he was intoxicated and exhibited a drinking problem. Johnson further testified she would help Bene with S.Y. if she were permitted to relocate to California, including transporting S.Y. to and from school, where S.Y. would attend with her daughter, S.Y.'s cousin; she would also be caring for S.Y. when Bene could not.  Johnson admitted she never witnessed Ryan exhibit any abusive or unsafe behavior toward S.Y.

---

[4] The transcript of this two-day hearing was not included in the record on appeal.  However, the record contains a lengthy bystander's report detailing the testimony presented.  Additionally, the transcript of the hearing held by the trial court to address Ryan's subsequent motion to reconsider is contained in the record in full.

¶ 10    Bene testified she is a surgical technologist employed by a hospital in California, where she has been working for the past year. She detailed that her relationship with Ryan "changed drastically" after S.Y. was born, with Ryan consuming more alcohol than usual and being more emotionally and physically abusive towards her and causing several alleged instances of domestic violence. She first left for California with S.Y. shortly after her birth after one such alleged incident, fearing for her and S.Y.'s safety. She returned, but the abuse worsened, and she recounted an instance when S.Y. was supposed to be in Ryan's care but he had left her at a friend's home; Bene called him and he appeared "extremely intoxicated." She further testified that despite all this, she believed Ryan was a good father and that, if permitted to relocate with S.Y., she would facilitate the maintenance of Ryan and S.Y.'s relationship. She believed it was in S.Y.'s best interest to relocate with her for several reasons, including that she had an employment offer in California with a limited acceptance time; she had just purchased a bigger home in safe, gated community; and her immediate family, including S.Y.'s half-brother, lived nearby and provided support and assistance. She concluded by explaining she told Ryan throughout their relationship that she wanted to return to live in California, and while she acknowledged some of her various instances of improper removal of S.Y., noncompliance with orders, and interference with Ryan's court-ordered parenting time over the years, she did not believe S.Y. was safe with Ryan due to his history of domestic and alcohol abuse.

¶ 11    On Ryan's behalf, his friend, Hugh Lindsay, testified that he has observed Ryan over the last six years, as S.Y. and Lindsay's daughters attended dance classes together, and he believed Ryan is an excellent father and very involved with S.Y.'s education and

extracurricular activities. He has never witnessed Ryan drink alcohol nor exhibit aggressive behavior toward S.Y. He did not believe Ryan's current relationship with S.Y. could be sustained if S.Y. were permitted to relocate. Lindsay admitted he has never met Bene and, thus, could not assess how she is as a parent. Ryan's long-time friend, Freddie Mims, testified Ryan is a "great father" who worked hard to get S.Y. admitted into the gifted program at her school and to become an accomplished swimmer. S.Y. never exhibited any fear or discomfort around Ryan but, rather, they have "an excellent relationship." Mims admitted Ryan consumes alcohol but does so only casually and not excessively; he has never seen Ryan intoxicated in S.Y.'s presence. Mims also admitted he has only met Bene a few times, when the parties were dating. Ryan's cousin, Ashley Gray-Holloman, testified she and Ryan grew up together, and the parties often relied on her to care for S.Y. She stated Ryan and S.Y. exhibit a very close and loving relationship. Her interaction with Bene has been minimal, and she has witnessed several heated exchanges between the parties over the years taking place in front of S.Y. She noted S.Y. is enrolled in a great school in Chicago, has a good friend group, and is thriving. Holloman admitted she has witnessed Ryan drink alcohol, once doing so while at her home with S.Y., but she has never seen him drink to the point of belligerence.

¶ 12    Ryan testified the parties became pregnant early in their relationship and their relationship was "toxic" on both their parts. They argued frequently, but he denied he was ever physically abusive toward Bene. He also denied that he drank excessively and pointed out he never failed any of his court-ordered alcohol tests. He detailed many instances when he was awarded parenting time by the court with which Bene interfered without explanation

7

or remorse, as well as various court orders with which she was noncompliant. Ryan recounted those times Bene removed S.Y. to California without notice or his consent, pulling her out of her school and failing to provide him with an itinerary or information regarding their whereabouts. Ryan further testified that since the institution of the relocation proceedings, S.Y. has lived primarily with him in Chicago over the last year. Ryan and S.Y. have established a routine involving school, where he worked hard with her to achieve her admittance into the gifted program, and extracurricular activities. Ryan volunteers at the school and knows all S.Y.'s teachers, whereas Bene does not. S.Y. speaks to Bene over the phone when she can. Although his parents are deceased, Ryan's support system includes his cousin and friends. He believed it was in S.Y.'s best interest to remain in Illinois with him for several reasons, including that he has been taking excellent care of S.Y.; relocation would severely impact his very close current relationship with S.Y., who seems "minimally impacted" by her current separation from Bene; and relocation would jeopardize S.Y.'s relationship with her younger half-sister. He also testified that he believed Bene "was a bad mom," and that she was not an involved parent nor provided S.Y. with "structure." Ryan admitted S.Y. clearly loves Bene. He also admitted he knew during his and Bene's relationship of Bene's desire to move back to and live in California.

¶ 13    The GAL testified at length during the hearing, detailing the contents of her report to the trial court. She first met then nine-year-old S.Y. via Zoom from her room at Ryan's home in March 2023, after her school day and extracurricular activities. The GAL described her room was dark and her demeanor was subdued; they spoke about her school and her half-sister. S.Y. expressed the desire to continue living in Illinois with Ryan and to see Bene on

school breaks. The GAL preliminarily recommended S.Y. stay in Illinois. However, the GAL's recommendation changed upon further interviews. She next met with S.Y. at Bene's home in California in July 2023, while she was on summer vacation. She noted S.Y. "seemed like a notably different child," as she was bright and excited. At this time, S.Y. expressed her desire to live in California with Bene. She also stated she did not want to hurt either of her parent's feelings and she was comfortable in both locations. The GAL further testified that S.Y. recounted an alleged fight she witnessed between Ryan and his girlfriend, and S.Y. told the GAL that she believed Ryan was drunk at the time. She also disclosed that Ryan drinks "almost an entire bottle of alcohol every night," and that he "could not help it." The GAL met with S.Y. a third time a few months later, again at Ryan's residence after school and her activities. She noted S.Y.'s disposition "again seemed dramatically different," and that she backed away when the GAL reached out to her and did not return her smile. When the GAL asked her if she still wanted to live in California, S.Y. again responded that she did not want to hurt either parent.

¶ 14      In addition to the parties' collateral witnesses, the GAL interviewed Bene, who expressed concern over Ryan's alleged alcohol abuse and history of domestic violence. The GAL found Bene's intentions to relocate were "genuine," as Bene wanted to care for her son and explained she left Illinois to escape Ryan's domestic violence. The GAL further noted that Bene did not intend to interfere with Ryan's relationship with S.Y. Conversely, the GAL testified that during her interview with Ryan, he expressed he was the better parent and that Bene was a " 'bad mother,' " and she noted that he was "obviously very angry" about the situation.

¶ 15    The GAL then informed the trial court of her determinations regarding each of the 11 statutory factors of section 609.2 of the Act, governing relocation. First, she concluded, as she previously testified, that Bene's intention to relocate was genuine, as she was originally from California and always wanted to return there. While she noted Bene's history of improperly removing S.Y., Ryan's alleged domestic abuse was an extenuating factor, as supported by her interviews with Bene's collateral witnesses. Second, the GAL believed that while Ryan and S.Y. had a close and loving relationship, Ryan's motivation for not agreeing to the relocation was to defeat Bene and prove she was a bad mother. Third, the GAL noted both parties have exercised their rights and responsibilities to S.Y. With respect to schools, the GAL's research found there was "not much of a difference" between her school in Chicago and the proposed school in California; the GAL did note there was a superior school closer to Bene's residence than the proposed school, and Bene told the GAL she would look into it. Fifth, the GAL observed that Bene had a significant number of family members (including her son, twin sister, mother, aunts, uncles, nieces, nephews, and cousins) residing in California compared to Ryan's family in Illinois, giving Bene a better familiar network. Next, the GAL testified she "strongly believe[d]" S.Y. would be "a much happier child" in California per her direct observations, and the parties would be able to fashion a reasonable allocation judgment, even though Ryan would not be afforded the same parenting time he has currently. Along with those factors, the GAL further commented that S.Y. "clearly expressed her desire to live in California with" Bene and that it was possible to fashion a schedule for Ryan to visit her as much as possible. While she admitted there would be some impact on Ryan and S.Y.'s relationship, this could be minimized via technology. Finally, the

GAL testified that her recommendation took into account other factors, including Ryan's "verbal and physical abuse of" Bene and "his excessive use of alcohol."

¶ 16     On cross-examination, the GAL stated she did not believe the fact she interviewed S.Y. after school and activities in Illinois compared to summer vacation in California impacted S.Y.'s decision on where she wanted to live, because Bene's collateral witnesses stated S.Y. appeared to be a different person depending on her location, just as she, herself, had observed. The GAL admitted she did not perform an investigation into S.Y.'s Chicago school or the proposed school, nor into the quality of her relationships with Bene's immediate family as opposed to Ryan's support system; however, she believed being around immediate family was in S.Y.'s best interest. Finally, the GAL acknowledged Ryan had not failed any court-ordered alcohol testing and she had not witnessed abuse between the parties since the time of her appointment.

¶ 17     Following closing argument, the trial court issued its Memorandum of Opinion and Order. At the outset, the court provided a short procedural history and stated it had reviewed and considered "all relevant pleadings, motions, responses, replies, exhibits, the GAL's report, testimony and oral arguments" in the matter. It also described the "serious co-parenting challenges" the parties have faced over the years and their "contemptuous and disrespectful parenting relationship."

¶ 18  Next, the court examined the evidence presented regarding section 609.2's 11 statutory relocation factors, summarizing the parties' conflicting testimony and the GAL's testimony and opinion with respect to each factor.[5]

¶ 19  In the last section of its Order, the court provided its final analysis of the statutory factors and its evaluation of the evidence presented. It found that six factors (1, 2, 5, 6, 8 and 11) "weigh more heavily" in Bene's favor. In this respect, the court concluded there was no credible reason to believe Bene filed her petition to relocate simply to interfere with S.Y. and Ryan's relationship; instead, the court found Bene desired to return to her home in California due to her injured son, her family's support, and the "high conflict parenting relationship between the parties." Particularly, it noted that while Ryan has some support in Illinois, Bene "has [a] stronger family presence and support system" in California. It also noted that Ryan believes Bene is a " 'bad mother' but provided little evidence to support this." The court "gave considerable weight" to Ryan's "proclivity to alcohol abuse and aggressiveness," which "has led to the verbal and mental abuse of" Bene, as well as the instances when Bene reported Ryan was drunk with S.Y. in his care. This was accompanied by S.Y.'s own reports to the GAL that he was drunk during the recent argument with his girlfriend which took place in front of S.Y., S.Y.'s sentiment that he " 'can't help' " his drinking, and the GAL's opinion that S.Y. sometimes appears " 'afraid' " of Ryan. The court found that Ryan "does not consider S.Y. when he elects to drink and act out" in her presence and that this was not in her best interest. As to the remaining factors (3, 4, 7, 9 and 10), the court found these to be

---

[5] As Ryan challenges the court's holdings as to all the 11 statutory factors, we enumerate and discuss the evidence it considered with respect to each of them in more detail below.

"neutral meaning that" both parties would provide S.Y. with excellent educational opportunities and extracurricular activities in either state; both love her and have played an active role in her life; neither has refused parenting time or responsibilities; and a reasonable allocation plan and visitation arrangements can be fashioned for the continued exercise of parental responsibilities appropriate to the parties' resources and S.Y.'s development.

¶ 20     At the conclusion of its Order, the court found that, "[b]ased on all the factors," "the testimony and credibility of all the witnesses," the GAL's report and S.Y.'s best interest, S.Y.'s general quality of life would be enhanced upon relocation with Bene. The court declared it was in S.Y.'s best interest to relocate, and she had expressed her wishes to do so via the GAL. The court went on to fashion what it deemed a reasonable allocation of parental responsibilities, with the goal of minimizing any impairment on S.Y. and Ryan's relationship. Accordingly, the court granted Bene's petition to relocate with S.Y., and the remainder of its Order provided a detailed parenting time and visitation plan for Ryan.

¶ 21     Ryan filed a motion to reconsider. At an ensuing hearing, Ryan argued that, while the court did not err in applying the law, it erred in its review of the facts presented and, thus, in its final determination. Ryan addressed the 11 statutory factors and outlined how the court incorrectly applied and inappropriately weighed the evidence regarding each one. The court denied Ryan's motion to reconsider, as he did not meet his burden of demonstrating newly discovered evidence, changes in the law or the court's error in applying the law but, rather, sought only a reexamination of the decision and a reassessment of the facts. However, as to this point, the court made clear for the record that it had "carefully considered all witnesses,

the law, credibility, the evidence, and most importantly the best interest of the child" in rendering its final decision.

¶ 22                                   ANALYSIS

¶ 23        On appeal, Ryan contends that the trial court's grant of Bene's petition to relocate S.Y. to California was against the manifest weight of the evidence. He presents challenges to each of the 11 statutory factors, asserting that the court erred in its conclusions, disregarded evidence, and discounted or underestimated the impact relocation would have on him and the father-child relationship. He also asserts that the court gave "unbalanced weight" to allegations of abuse and permitted prejudicial evidence against him. We disagree.

¶ 24        As Ryan points out in his brief, pursuant to the Act, the burden rests with the parent seeking relocation to prove that relocating the minor child is in her best interest, as measured by the 11 factors enumerated in section 609.2(g) of the Act. See *In re Marriage of Kenney*, 2023 IL App (1st) 221558, ¶ 36 (citing *In re Marriage of Kimberly R.*, 2021 IL App (1st) 201405, ¶ 78 (citing *In re Marriage of Levites*, 2021 IL App (2d) 200552, ¶ 57)). Here, that was Bene; as the petitioner, she had both the burden of production (to produce evidence on S.Y.'s best interest) and persuasion (to convince the court that S.Y.'s best interest included her relocation to California) pursuant to the statutory factors. See *Kenney*, 2023 IL App (1st) 221558, ¶ 36 (citing *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 78; *Levites*, 2021 IL App (2d) 200552, ¶ 61); see also *In re Parentage of P.D.*, 2017 IL App (2d) 170355, ¶ 15; and *In re Marriage of Eckert*, 119 Ill. 2d 316, 325 (1988)).

¶ 25        Ryan is also correct that the applicable standard of review is manifest weight of the evidence. This standard is most appropriate for relocation matters because they necessarily

involve the best interest of the child. See *Kenney*, 2023 IL App (1st) 221558, ¶ 33 (citing *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32, and noting this standard applies for that very reason). The marked deference of this standard " 'recognizes that the trial court, as the trier of fact, had a superior opportunity "to observe both parents and the child and, thus, is able to assess and evaluate their temperaments, personalities, and capabilities." ' " *Kenney*, 2023 IL App (1st) 221558, ¶ 33 (quoting *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 75 (quoting *Fatkin*, 2019 IL 123602, ¶ 32)); accord *In re Marriage of Dorfman*, 2011 IL App (3d) 110099, ¶ 46.

¶ 26        Accordingly, under this standard, we, as a reviewing court, cannot reverse a lower court's grant of a relocation petition " ' "unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred." ' " *Kenney*, 2023 IL App (1st) 221558, ¶ 33 (quoting *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 75 (quoting *Fatkin*, 2019 IL 123602, ¶ 32). "A court's decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent or where its findings are unreasonable, arbitrary, or not based on the evidence presented." *In re Marriage of Kavchak*, 2018 Il App (2d) 170853, ¶ 65; accord *Kenney*, 2023 IL App (1st) 221558, ¶ 33 (reversal is permitted only when the opposite conclusion is called for because the trial court's factual findings are clearly, plainly, and indisputably erroneous).

¶ 27        Specifically, section 609.2 of the Act governs relocation. In subsection (g), the legislature enumerated 11 factors a trial court must consider in determining whether relocation is in the child's best interest and, thus, appropriate. See 750 ILCS 5/609.2(g) (West 2022); *P.D.*, 2017 IL App (2d) 170355, ¶ 17. As this Court recently noted in *Kenney*,

our supreme court has made clear that relocation determinations " ' "cannot be reduced to a simple bright-line test." ' " *Kenney*, 2023 IL App (1st) 221558, ¶ 57 (quoting *Fatkin*, 2019 IL 123602, ¶ 32 (quoting *Eckert*, 119 Ill. 2d at 326)). Rather, precisely because the child's best interest is involved, relocation decisions " ' "must be made on a case-by-case basis, depending, to a great extent, upon the circumstances of each case." ' " *Kenney*, 2023 IL App (1st) 221558, ¶ 57 (quoting *Fatkin*, 2019 IL 123602, ¶ 32 (quoting *Eckert*, 119 Ill. 2d at 326)); accord *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 74. And, because a relocation case's unique facts dominate it, comparisons to other relocation cases are of little value. See *Kenney*, 2023 IL App (1st) 221558, ¶ 57; *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 74 (citing *Levites*, 2021 IL App (2d) 200552, ¶ 71). "[T]he determination of a relocation petition

> ' "cannot be reduced to a simple tally of which party 'won' a majority of the enumerated factors; instead, because some factors in a particular case may weigh more heavily than others, the trial court must consider all factors and evidence touching on the issue and must arrive at a reasonable result." ' *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 74 (quoting *Levites*, 2021 IL App (2d) 200552, ¶ 71)."

*Kenney*, 2023 IL App (1st) 221558, ¶ 57. Ultimately, " ' " '[t]he presumption in favor of the result reached by the trial court is always strong and compelling in this type of case,' " ' " (*Kenney*, 2023 IL App (1st) 221558, ¶ 33 (quoting *Fatkin*, 2019 IL 123602, ¶ 32 (quoting *Eckert*, 119 Ill. 2d at 330 (quoting *Gallagher v. Gallagher*, 60 Ill. App. 3d 26, 31-32 (1978)))); accord *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 75), and while we are called upon to examine the reasonableness of the result, we will not "reweigh the evidence or assess the

16

credibility of testimony and set aside the trial court's determination merely because a different conclusion could have been drawn from the evidence" (*P.D.*, 2017 IL App (2d) 170355, ¶ 19 (this is not the function of reviewing court in relocation matters)).

¶ 28    In its Order granting Bene's petition to relocate, the trial court addressed each of the section 609.2(g) factors with specificity and weighed each one in light of the evidence presented.  It found six favored Bene and five were neutral; it did not find any favored Ryan. Ryan challenges each one of those findings.  We address them now, concluding that, based on the record before us, the court's decision to grant relocation of S.Y. was not against the manifest weight of the evidence.

¶ 29    The first 609.2(g) factor is "the circumstances and reasons for the intended relocation." 750 ILCS 5/609.2(g)(1) (West 2022).  The trial court found this weighed more heavily in Bene's favor, stating it believed Bene's testimony that she returned to California to care for her injured son and there was "no credible reason to believe that she filed [the petition] simply to interfere with S.Y. and [Ryan]'s relationship." Additionally, the court found there were valid "circumstances" underlying Bene's desire to relocate, including the "high conflict parenting relationship between the parties," prompting her to return to where she had familial support.

¶ 30    The evidence underwrites this assessment.  The GAL, who interviewed Bene and Ryan on multiple occasions, testified she believed Bene's intentions to relocate were "genuine," and she indicated this in her written report as well.  The GAL detailed for the court Bene's assertions that she wanted to be in California to care for her son who was involved in a serious car crash in the summer of 2022, and to escape Ryan's domestic violence against her.

17

While the GAL did not condone Bene's history of improperly removing S.Y. in violation of prior court orders, she stated she did not believe Bene was intending to interfere with Ryan's relationship with S.Y. under the circumstances, which included the parties' volatile relationship. Bene's testimony corroborated the GAL's. Additionally, Bene testified she had just purchased a bigger home in California in a gated community for her and S.Y. and that she had a new nursing job offer there. Significantly, she testified she had repeatedly told Ryan while they were together that she wanted to return to live in California, her state of origin—a fact Ryan admitted during his own testimony he was aware of throughout their relationship.

¶ 31 Ryan asserts the court "failed to consider and appropriately weigh" Bene's "antics and attempts to conceal" S.Y. in order to "advance her relocation efforts." He also discusses the several times Bene removed S.Y. to California without providing him notice, the court orders he obtained finding she had absconded with S.Y., and her violations of his court-ordered parenting time. He further cites Bene's initial February 2022 notice of relocation which he claims was "improper" and suspicious as it occurred three months before her son's accident, and her alleged failure "to provide evidence of any 'better life' " for S.Y. in California.

¶ 32 Ryan's assertions do not support reversal of the court's determination as to this factor. Upon our reading of the decision, the court clearly, and repeatedly, considered the many times Bene removed S.Y. from Illinois. The court specifically stated, in both its decision and in its colloquy during the motion to reconsider, that it had examined all the relevant "pleadings, motions, responses, replies, [and] exhibits" in this matter, which included Bene's history of removal. There was testimony about this from several witnesses and the GAL

18

outlined this in her report, stating she had "reviewed" all the prior litigation filed by the parties and resulting court orders since November 2013; she listed these (some 25) in the report she submitted to the trial court. And, the court even noted in its written Order that Bene "was previously sanctioned for 'unauthorized relocation.' " Thus, contrary to Ryan's claim, the court did consider and weigh this; it simply did so in a way with which he disagrees.[6]

¶ 33      Moreover, we find no merit in Ryan's assertions regarding what he deems Bene's "improper" or suspicious petition to relocate in February 2022. Yes, the evidence indicates Bene texted Ryan in February 2022 informing him she wanted to relocate with S.Y., and this occurred before her son's accident. However, when Ryan returned her text with an objection, that was the end of the matter. Bene never filed a formal petition to relocate at that time. Rather, she did not file her formal petition, in court, until October 25, 2022—*after* her son's accident and after she had been making trips back and forth from Illinois to California to care for him. That Bene may have conveyed to Ryan she contemplated filing a petition in February does not negate, discredit, or cast suspicion on the petition she actually filed some eight months later, particularly where the evidence shows both that her son was injured in the meantime and that Ryan knew throughout their relationship Bene always wanted to return to California.

---

[6] Ryan does not lodge a claim of error under section 609.2(d), which governs statutory notice requirements placed on the relocating parent. However, we note for the record that a relocating parent's violation of section 609.2(d)'s statutory notice requirements does not require automatic denial of her petition or preclusion of relocation; the only consequence is that the trial court "may consider" it as a factor in determining good faith with respect to relocation and once it does so, and its conclusion is supported by the record, there is no error. See *Kenney*, 2023 IL App (1st) 221558, ¶¶ 54-55.

¶ 34    Also, we do not agree with Ryan that Bene "failed" to provide any evidence of how S.Y.'s life could, or would, improve in California. Rather, the court discussed throughout its decision that Bene, whom it found credible, had demonstrated this. We will discuss this more herein, but suffice to say with respect to this first factor, Bene provided testimony of the new home she had purchased in a gated community and of a new job offer pending her relocation. Based on all this, we do not find any error in the court's conclusion that factor (1) weighed in favor of Bene.

¶ 35    Factor (2) comprises "the reasons, if any, why a parent is objecting to the intended relocation." 750 ILCS 5/609.2(g)(2) (West 2022). The trial court found this factor favored Bene. It noted that Ryan's objection to the relocation was principally based on his belief that Bene was, as he put it in many instances, a "bad mother." The court declared, however, that this was not borne out by the evidence.

¶ 36    In contending the court's finding was manifestly erroneous, Ryan again cites to Bene's history of non-compliance with court orders, and to his and his witnesses' testimony that he plays a significant role in S.Y.'s life while Bene does not. We do not minimize neither Bene's history nor Ryan's devotion to S.Y. However, the court's conclusion that factor (2) favored Bene was not unreasonable in light of the evidence presented. That is, both during her testimony and in her written report, the GAL testified that, upon her observations and interviews of the parties, she believed Ryan's motivation for objecting to the relocation was more so to defeat Bene in the litigation and to demonstrate she was a "bad mother," rather than contemplating which location was really better suited for S.Y. She noted he used this phrase during their interview, expressing he was the better parent while also demonstrating

20

he was "obviously very angry" about the situation. This was corroborated by Ryan's own testimony, wherein he referred to Bene before the trial court as "a bad mom" and that she was not an involved parent nor provided S.Y. with "structure." Bene, meanwhile, testified that despite their tumultuous relationship, she believed Ryan was a good father. Also, we recognize that Ryan's witnesses testified at length about his admirable parenting skills. However, none of them provided any evidence to support the assertions he repeatedly made during the proceedings that Bene is a "bad mother." In fact, all his witnesses admitted they could not say what type of parent Bene was: his friend Lindsay stated he has never met Bene, his friend Mims stated he only met Bene a few times when they were dating, and his cousin Holloman stated her interaction with Bene was very minimal, taking place only during heated exchanges between the parties. Without more, we cannot find the court's decision that factor (2) favored Bene was unreasonable.

¶ 37    The third factor the court considered was the history and quality of each party's relationship with S.Y. and whether they had failed or refused to exercise parental responsibilities. See 750 ILCS 5/609.2(g)(3) (West 2022). The court noted that, based on the testimony of the parties and their witnesses, it was clear both Bene and Ryan have played an active role in S.Y.'s life since her birth, fully exercising their parental responsibilities, establishing a close and loving relationship with her, and exercising substantial parenting time, including periods of separate majority parenting time. Commenting that both wanted the best for S.Y. and her future, the court thus found this factor to be neutral. Ryan disputes this finding, arguing that the court should have taken more note of the fact that he has cared, and "shouldered all the parenting responsibilities," for S.Y. for the last 18 months (from

21

November 2022 until April 2024, the date of the court's Order), rendering him the primary caretaker save for one month when S.Y. went to California to stay with Bene for summer vacation. We are mindful that S.Y. lived with Ryan exclusively for the 18 months prior to the court's issuance of its final decision. But, that does not render the court's neutrality finding as to this factor unreasonable. S.Y. primarily lived with Ryan and he assumed parenting responsibilities during this time. The trial court was aware of this. However, as the court stated, both parties shouldered primary parenting responsibilities at various times from S.Y.'s birth to the date of the Order. This was more than evident throughout the record. Just as she lived exclusively with Ryan for an extended period before this decision, there were times in the past when S.Y. lived with Bene for extended periods. That is, while the parties generally shared 50/50 custody, there were periods where one of them served as S.Y.'s primary caretaker while the other sought and/or exercised court-ordered parenting time. Accordingly, the court's conclusion that this factor was neutral was not against the manifest weight of the evidence.

¶ 38    Similarly, the trial court found the fourth factor, "educational opportunities for the child" at each location, was neutral. 750 ILCS 5/609.2(g)(4) (West 2022). The court pointed out the GAL, who visited S.Y. in both California and Chicago, "established in her testimony that there is an insignificant and minimal difference in opportunity between the proposed schools [of] California and the minor child's current school in Illinois." Noting, as well, the parties' active relationships with S.Y., the court further stated that, as each of them clearly wants the best for her, it was sure they "will seek out the best educational and extracurricular opportunities for her."

¶ 39    In his claim that this factor should have favored him, Ryan makes much of what he asserts was the court's disregard of the gifted program S.Y. is enrolled in at her school in Illinois which he "fought hard to get [her] placed in," and its ignorance of Bene's true motivation for selecting the California school some 30 minutes from her home, which was that S.Y.'s cousins attend there and it is more convenient for Bene's sister to access as she, and not Bene, will be transporting S.Y. to and from school when Bene works.  Ryan notes the court did not comment on the California STEM school much closer to Bene's home the GAL proposed for S.Y. which Bene said only that she would look into, and he takes issue with what he deems was the GAL's insufficient research of the schools, such as neither speaking to teachers and principals nor comparing curricula and ratings.

¶ 40    We find that the trial court's neutral finding as to this factor was not arbitrary nor manifestly erroneous; rather, it was supported by the evidence.  The trial court heard much testimony, mostly from Ryan, regarding S.Y.'s gifted program; clearly, the court was aware of this and the lengths Ryan has gone to in order to give S.Y. the best education he can. However, there was other testimony, mainly from Bene and her witnesses, explaining that when S.Y. was living with her, she attended a certain elementary school in Beaumont, California, for three months.  Despite Bene's move from Beaumont to Ontario, California (approximately 30 minutes away), she planned to return S.Y. to the Beaumont school.  Bene explained that her sister will be caring for S.Y. when she is at work, and this would mean taking her to and picking her up from school when needed.  Bene's sister still lives in Beaumont and her children (S.Y.'s cousins) attended that school with S.Y. when she lived there and they continue to attend currently—a school S.Y. is familiar with as a former

23

student, she knows the staff, and she will have a built-in friend group of prior classmates and relatives. Considering both these important perspectives (scholastic program versus familiarity), it is not unreasonable that the court deemed this factor neutral.

¶ 41        Critically, we do not accept Ryan's characterization of the GAL's research as insufficient because she did not interview the staff at each school or compare curricula and ratings. In fact, the record partially dispels Ryan's assertion. He seems to be correct that the GAL did not speak to teachers or principals at either school. Yet, this is not required pursuant to section 609.2(g) for the court to properly evaluate this factor. More importantly, however, while the GAL may have only briefly testified at the hearing that it was her view there "not much of a difference" between S.Y.'s school in Chicago and the proposed school in California, her report contained much detailed comparative research between them. That is, in her written report submitted to the trial court, which is contained in the record, the GAL notes the location of both schools. She then presents her online research:[7] she found that S.Y.'s Chicago community is rated an A, but her school is rated a B-, with only 32% of students proficient in reading and math; meanwhile, the proposed community in California is rated a B-, but the proposed school is rated a B+, with 60% of students proficient in reading and 57% proficient in math. The GAL also examined the racial composition of the schools, a relevant consideration as S.Y. is of mixed-race; she noted the Chicago school is 71% black compared to only 5% at the proposed school, but the total minority enrollment of the

---

[7] In her report, the GAL referred to ratings "on Niche" when making comparisons of the schools. This Court may take judicial notice that www.Niche.com is a website devoted to rankings for schools nationwide offering education from preschool to 12th grade, be they public, private, religious, special education, charter, magnet, Montessori, etc. See *Kopnick v. JL Woode Management Co., LLC*, 2017 IL App (1st) 152054, ¶ 26 (citing *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 118, n.9 (this Court may take judicial notice of information on public websites)).

proposed school is 73%. As to the STEM school the GAL researched near Bene's new home, while it was rated superior to both the Chicago and the proposed California schools, Bene explained that she could not provide secure childcare to send S.Y. there. Ultimately, the point is this: the court did, indeed, have much evidence before it, thanks to the GAL, as to the differences in the schools. Its evaluation was that the differences were negligeable, especially considering its view that both Ryan and Bene were dedicated to seeking out the best educational opportunities for S.Y.; it also found important the considerations of S.Y.'s familiarity and available childcare. In light of all the evidence presented, and contrary to Ryan's insistence, there was a sound basis for the court's neutral finding.

¶ 42    In challenging the fifth factor of "the presence or absence of extended family" at each location (750 ILCS 5/609.2(g)(5) (West 2022)), which the court found favored Bene, Ryan argues it improperly "discounted" his "extended family" in Illinois, particularly his cousin Holloman who testified she would pick S.Y. up from school if needed, and a family friend who testified Ryan once enrolled in and drove S.Y. to a faraway summer camp just so she could attend with her friends. He also contends the court ignored that S.Y. has a paternal two-year-old half-sister in Chicago, and that it "was only entranced by" the existence of Bene's extended family which caused it to "trump [his] active daily involvement" as a father.

¶ 43    In its decision, the court acknowledged Ryan has "some support in Illinois," specifically, an " 'extended family' " comprised of cousins and friends who the parties relied on in the past to help care for S.Y., as well as a young daughter with whom S.Y. has a close relationship. The testimony confirmed this; Ryan's parents (S.Y.'s paternal grandparents) are deceased and as he has no siblings, his cousins and friends serve as his family, and some

of them testified as to their time caring for S.Y. while she lived in Illinois. However, the court balanced this with Bene's "strong presence of family in California." This includes her 16-year-old son (S.Y.'s older maternal half-brother), and her mother (S.Y.'s grandmother), as well as her twin sister and various aunts, uncles, nieces, nephews and cousins. Ryan may have a support system in Illinois, but the fact remains the majority of its members are nonrelatives. Meanwhile, the court found that S.Y. is surrounded by "a stronger family presence and support system in California" made up of direct relatives and an older brother who can tend to her needs, if required. While other arbitrators may have weighed Ryan's support system differently, this is what the trial court determined was best for S.Y. and, as it was based on the evidence presented, we cannot overturn it.

¶ 44        With respect to factor (6), the anticipated impact of relocation on the child (see 750 ILCS 5/609.2(g)(6) (West 2022)), the trial court acknowledged S.Y. "has significant ties to the State of Illinois," but also recognized she has spent time in California and the GAL was " 'convinced that S.Y. will be a much happier child in California, than in Illinois' based upon her observations of S.Y.'s behavior in both places." Thus, the court found this factor weighed in favor of Bene. Ryan insists the court "failed to discern the circumstances surrounding the GAL's meetings" with S.Y., suggesting the findings were skewed because she met with S.Y. once in California while she was on summer vacation, but met with her twice in Illinois, once in person and once on Zoom, both after full days of S.Y.'s "arduous gifted program" and activities.

¶ 45        The record shows, contrary to Ryan's insistence, that the court did, indeed, discern the circumstances surrounding the GAL's meetings with S.Y., as he characterizes them. The

26

GAL testified at length about her visits with S.Y. and was clear in her testimony that her California visit took place during summer vacation and her two Illinois visits took place after school, with the initial one via Zoom. This was not a secret. The GAL went on to testify that the first Illinois Zoom meeting was from S.Y.'s room which she noted was "dark" with her curtains having been drawn, that it was March in Chicago, and that S.Y.'s demeanor was "subdued." Nevertheless, after this meeting, the GAL preliminary recommended S.Y. stay in Illinois. This changed, however, following two more interviews. At the second, the GAL visited S.Y. in July in California. She noted S.Y. "was very happy, upbeat and outgoing" and "seemed like a notably different child" than when in Illinois, demonstrating brightness and excitement, particularly at showing the GAL her room. The GAL's last interview took place again in Chicago after school and activities, with the GAL noting S.Y. "again seemed dramatically different" than her last visit, as S.Y. backed away from her when she reached out, did not return her smile, and spoke in a "low and monotone" voice. The GAL's direct observations prompted her to change her recommendation.

¶ 46    There is no basis to reverse the court's ruling on this factor. The record is clear that the GAL changed her recommendation, as the trial court stated, on her observations of S.Y. at both locations. If, as Ryan posits, it was somehow unfair that S.Y. was interviewed after a long day at school and activities in March in Illinois compared to summer vacation in July in California (or that the GAL and/or the court improperly failed to discern this difference), then the GAL would not have preliminarily recommended she stay in Illinois after the first Zoom visit. That is, the GAL immediately noted S.Y.'s room was dark and she was subdued; however, she still concluded S.Y. should stay in Illinois. It was not until she visited S.Y. two

27

more times and observed the differences in her *behavior*, rather than in the time of day or year, from one location to the other that she switched her recommendation. Once her visits were complete, she compared her observations that S.Y. acted in a brighter and more excited and open way while in California with Bene than when she was in Illinois with Ryan, where she was skittish and closed-off. Significantly, Ryan's counsel cross-examined the GAL with precisely the same insinuations he now raises on appeal, *i.e.*, whether she believed the difference in times and dates impacted S.Y. and their interviews, and she responded in the negative. Also of note, several witnesses who testified at the relocation hearing corroborated the GAL's description of S.Y. acting differently in these ways depending on whether she was in Illinois with Ryan or in California with Bene. From all this, we find no error in the court's finding that this factor favored Bene.

¶ 47     Ryan next asserts that the trial court erred in holding that factor (7), whether "a reasonable allocation of parental responsibilities" can be fashioned upon relocation (750 ILCS 5/609.2(g)(7) (West 2022)), was neutral because it "failed to consider" Bene's "disregard" and "disrespect" of the court and its orders and the "likelihood" that she will ignore subsequent orders, including the new Allocation Judgment. We are mindful of the assertions Ryan makes, particularly in light of the history of this matter he has highlighted, pointing out the many times Bene failed to abide by his court-ordered parenting time and the equally many times (if not more) he sought court orders to enforce his parental rights. We are also mindful that the Allocation Judgment, entered by the trial court upon its grant of the relocation petition, will reduce Ryan's parenting time with S.Y.—dramatically so, when one considers she lived with him for the 18 months prior to the ruling. Yet, this is inherent in the

28

nature of relocation decisions; as parents cannot be forced to live in the same state, one will inevitably lose parenting time when a child relocates.

¶ 48    Ryan is correct that, if a noncustodial parent has diligently exercised his rights, then a court "should not interfere with those rights for frivolous, unpersuasive or inadequate reasons" (*In re Marriage of Gibbs*, 268 Ill. App. 3d 962, 968-69 (1994)).  However, the record shows that the trial court here provided many reasons that were not frivolous, unpersuasive, or inadequate in determining that a reasonable allocation could be fashioned— reasons it supported via record evidence.  Moreover, Bene testified that she was willing to allocate all vacation and holiday time to Ryan and would abide by the court's judgment. This is, in fact, what the court ordered, giving Ryan every spring, summer, Thanksgiving, and winter break with S.Y. in Chicago, and two additional parenting time periods in California and video call parenting time three days a week.  Without more, we cannot find that this allocation was unreasonable and, thus, there is no basis to reverse the court's finding that this factor was neutral.

¶ 49    In challenging the finding that factor (8), the wishes of the child, taking into account her maturity and ability to express reasoned and independent preferences as to relocation (750 ILCS 5/609.2(g)(8) (West 2022)), weighed more heavily in favor of Bene, Ryan posits that the court should have instead found this factor to be neutral since S.Y. vacillated when asked where she wanted to live.  He claims that, as the court did not interview S.Y. *in camera*, it relied on the GAL, who reported that when she interviewed S.Y. in Illinois, she stated she wanted to live there, and when she interviewed S.Y. in California, S.Y. stated she wanted to live there.

¶ 50    It is true that S.Y. vacillated with respect to her wishes about where she wanted to live. However, Ryan slightly mischaracterizes the GAL's report in this respect and, more importantly, his argument that S.Y.'s vacillation should automatically render the factor neutral does not take into account the full context of S.Y.'s interviews with the GAL. Yes, when the GAL first interviewed S.Y., it was in Chicago and S.Y. expressed a desire to live there. However, this was not S.Y.'s immediate response. Rather, as detailed in her report, the conversation between the GAL and S.Y. regarding where she wanted to live began with the GAL asking S.Y. "what she wanted her schedule to look like," and "[a]t first [S.Y.] said she would like to be in both places equally." The GAL then explained to S.Y. that "it would be very hard to go to school in both states at the same time," and instead proposed a "recommendation of going to one school and staying put and maybe seeing her mother during vacation and holidays." It was only then, *after* S.Y. initially stated she wanted to live in both places and *after* she was told this was not feasible, that S.Y. "said she felt good about [the GAL's] recommendation" to stay in Illinois.

¶ 51    When the GAL interviewed S.Y. later in California, as S.Y. lived there for a month, the GAL asked her to compare Chicago and California. S.Y. "said that both had good points, but that she wanted to stay with her mom in California." The GAL noted in her report that when she "asked why, [S.Y.] said that her mom was a girl and could help her better with girl things;" which the GAL "sensed that her mother had maybe discussed with her." The GAL also asked S.Y. if she "felt caught in the middle," whereupon S.Y. "burst into tears." The GAL comforted her by telling her that both Ryan and Bene loved her and the most important thing was for S.Y. to feel happy and most comfortable, and S.Y. repeated that, while she felt

happy and comfortable in both locations, "she felt like her mother could tell her things she needs to know, because she's a girl, too." The GAL's report states: "She then told me that she really wanted to live in California. But, she continued to be very worried about hurting or upsetting her father – she did not want his feelings to be hurt."

¶ 52    At their last meeting in Chicago, the GAL asked S.Y. "if she still felt the same way that she did in California, about staying there," and S.Y. "said she didn't know." In response, the GAL expressed that she knew S.Y. loved both parties and did not want to hurt either of them, which S.Y. affirmed. The GAL then told S.Y. she would not say that S.Y. chose one location over the other but, rather, would make a recommendation based on what was best for her, and S.Y. "said yes to that and seemed relieved."

¶ 53    Contrary to how Ryan reduces the context of discussions between the GAL and S.Y. about S.Y.'s wishes, the record shows that S.Y. did not simply state she preferred to live in one place over the other merely because she was physically present in that location when interviewed. Rather, it is clear that she took other considerations into account, many of which battled each other: her own comparisons of the locations, not wanting to hurt Ryan's feelings, reasoning she could receive more guidance from her mother regarding female issues, and, as the court recognized, being "very cognizant of the impact of any choice she make[s] on her parents." Based on the GAL's detailed report, we do not believe the trial court erred in finding this factor favored Bene.

¶ 54    The trial court found both relocation factor (9), the "possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child," and (10), the "minimization of the impairment to a

31

parent-child relationship" cause by relocation, to be neutral.  750 ILCS 5/609.2(g)(9), (10) (West 2022).  Ryan challenges these findings by claiming that the court focused too much on the availability of technology to minimize the impairment relocation will have on his relationship with S.Y. with whom he has lived for the last 18 months, while failing to consider that Bene testified S.Y. will be with her sister all day while she works.  Ryan's argument somewhat misses the mark.  These factors examine possible arrangements, parental resources, minimization of impairment and the child's development.  The trial court was aware of the time S.Y. lived with Ryan before its decision.  However, again, with relocation petitions, a school-age child cannot physically be with both parents for equal amounts of time.  It was not unreasonable for the trial court to cite technology like FaceTime and Zoom calls between Ryan and S.Y. as viable tools to minimize any impairment to their relationship, particularly since this was in line with the GAL's opinion on the matter and considering that S.Y. is about to enter her teenage years.  Moreover, while Bene admittedly testified that her sister will be driving S.Y. to and from school when she is at work, she also testified she has a flexible schedule.  Significantly, Ryan similarly admitted that when he works, it is sometimes until 9 or 10 pm and, thus, he likewise will be relying on others to care for S.Y. when he is unavailable.  Also, the court noted the GAL's opinion that S.Y. " 'is a very articulate and intelligent child.' "  While Ryan has indubitably done much to assist her in her scholastic and extracurricular development, and while S.Y. loves him very much and wants to maintain daily contact with him, the record shows that at her level of development—again, 12 years old and about to enter her teenage years—she has already been concerning herself with topics regarding her feminine development and has expressed her feelings that Bene may be able to

32

better assist her in those respects. Thus, that the court found these factors to be neutral was not manifestly erroneous.

¶ 55    Finally, factor (11) is a statutory catch-all provision, allowing the trial court to consider "any other relevant factors bearing on the child's best interest." 750 ILCS 5/609.2(g)(11) (West 2022). In its written Order, the trial court enumerated ten points it "gave the most weight to in terms of bearing weight on the child's best interest." These included: the family's involvement with DCFS with "unfounded" investigations; the family's involvement in criminal proceedings Bene filed against Ryan for sexual assault with a "not guilty" finding; Ryan's documented issues with alcohol abuse and treatment, after which he was granted parenting time; S.Y.'s report to the GAL of Ryan's excessive use of alcohol; S.Y.'s report to the GAL of a recent argument between Ryan and his girlfriend in front of her wherein she believed he was drunk; Bene's "credible evidence" of past verbal and mental abuse by Ryan; the GAL's opinion, corroborated by her observations and those of others, that S.Y. appears "afraid" of Ryan at times; Bene's historical interference with Ryan's parenting time; Bene's "little regard" for court orders and authority; and Ryan's failure to facilitate contact between Bene and S.Y. and refusing to allow unmonitored (electronic) parenting time between them while S.Y. has been living with him during these proceedings. Upon balancing these points, the court found factor (11) favored Bene. Specifically, it stated the basis for its determination was the "considerable weight" it was giving to Ryan's "proclivity to alcohol abuse and aggressiveness," which have led him to be verbally and mentally abusive. The court noted there was evidence of instances where Ryan was "drunk" when with S.Y., and that S.Y. herself reported both that he was "drunk" during an argument in

33

front of her and that he "can't help his drinking." The court found these instances demonstrate that Ryan "does not consider S.Y. when he elects to drink and act out in [her] presence" and renders S.Y. " 'afraid' of" him at times, which "is not in the best interest of the minor child."

¶ 56    Ryan challenges the court's determination that this factor favored Bene, at length. Principally, he asserts that the court gave "unbalanced weight" to allegations of his alcohol abuse and abuse toward Bene, which he characterizes as "dated and unfounded allegations made by Bene to bolster" her position in this matter. He argues that the DCFS reports were unfounded and were filed by Bene immediately before court orders requiring her to return S.Y. were about to expire, he was never convicted on any criminal charges of abuse, and there were no reports he ever failed any alcohol testing. He further claims the court wholly discounted the GAL's interview with his girlfriend who stated Ryan was not drunk during their argument, and he points out that the GAL never expressed the need for alcohol testing, evaluation, or treatment while S.Y. lived with him. In Ryan's view, he believes the court permitted "prejudicial evidence against" him of alleged behavior that occurred years ago rather than focusing on the last 18 months during which he cared for S.Y., resulting in reversible error.

¶ 57    Based on the record before us, we do not agree with either Ryan's contention that trial court gave "unbalanced weight" to abuse allegations nor with his assertion that it manifestly erred in determining factor (11) favored Bene rather than him.

¶ 58    As we discussed earlier, because relocation matters are *sui generis*, and because they center on the best interest of the particular child involved and the unique facts pertaining to

34

her situation (see *Kenney*, 2023 IL App (1st) 221558, ¶ 57), a court is not required to weigh or balance all the section 609.2(g) factors equally. Rather, while the court must, indeed, consider each and every statutory factor, it is inherent that "some factors in a particular case may weigh more heavily than others." *Kimberly R.*, 2021 IL App (1st) 201405, ¶ 7; accord *Fatkin*, 2019 IL 123602, ¶ 32 (the propriety of the court's determination should not be reduced to just a simple count of how many factors favor one party over the other). Accordingly, as long as the trial court considers all the factors, and as long as it arrives at a reasonable result in light of the evidence accompanying them, then we cannot find reversible error in its ultimate decision to grant a relocation petition.

¶ 59     Here, it is obvious that the trial court considered all the statutory factors; that is more than evident in its written Order, wherein the court provided both a detailed summary of the relevant facts it considered as to each factor and, separately, an analysis of each factor based on those facts. We have reviewed this exhaustively. When the court reached the final factor, factor (11), it specifically noted that the statute gives it "discretion to consider other relevant factors bearing on [S.Y.]'s best interest," and it went on to enumerate ten considerations it found significant.

¶ 60     Clearly, the court followed the mandates of the statute as a whole, and factor (11) specifically—to a T. We cannot find any reversible error in what the court did. Ryan is correct; the court did give unbalanced weight to his alcohol abuse and his aggressive behavior. It explicitly said as much. Yet, that was in the court's discretion, and it was not incorrect to do so under factor (11). As the court explained, it believed these things had a

35

direct impact on S.Y.'s best interest, under the circumstances of this particular case. And, the evidence fully supports the court's reasoning.

¶ 61   Initially, we note that Ryan's citations on appeal to the DCFS reports, criminal charges and alcohol tests are, essentially, of naught. Contrary to his intimations, the court did not consider these *against* him; rather, it mentioned them and, just as he does in his brief before this Court, it discounted them. The court made clear in its Order that the DCFS reports Bene filed against Ryan had been declared "unfounded," that Ryan had been acquitted and never convicted of any criminal charges, and that no evidence had ever been presented that he failed an alcohol test he was made to take under court order. Undeniably, the trial court already knew all these points.[8] Moreover, the record is undisputed that Ryan abused alcohol in the past and, in March 2016, when S.Y. was two years old, his parental rights were suspended and he was sent via court order to alcohol treatment and required to participate in regular testing to regain, and then maintain, parental access to her. Ryan completed treatment and continued to test negative, and his full parental rights were restored in June 2017. For this, he should be applauded.

¶ 62   What the court focused on, however, was S.Y.'s best interest, which it was required to do. And, in doing so, it found critical this point: Ryan's current use of alcohol, while in the presence of S.Y., his aggressiveness, and how these affect her. It was S.Y.'s revelations to the GAL, and not Ryan's years-old documented issues with alcohol, that were the tipping point for the court's determination with respect to factor (11). And, the record supports its

---

[8] For the record, concomitant with the considerations Ryan claims prejudiced him, the court also balanced considerations that were "negative" towards Bene, including her historical interference with Ryan's parenting time, her disregard of court orders, and her disrespect for the court's authority.

views. Long after Ryan's full parental rights were restored to S.Y. when she was 3 years old, and upon her interviews with the GAL in 2023 when she was almost 10 years old, S.Y. reported that Ryan and his girlfriend, Ami (the mother of S.Y.'s paternal half-sister who was approximately two years old at that time), had gotten into "a big fight, which involved hitting and the police were called." That fight took place in front of S.Y., and she detailed that police took her father's identification because "he was drinking and shouldn't drive while drunk." In addition to this incident, S.Y. went on to recount to the GAL that Ryan "has only be angry with her once," and while "she didn't think at the time that it was because he was drunk, [] now she thinks maybe he was." Ultimately, S.Y. further described for the GAL that Ryan "drinks almost a whole bottle of alcohol every night," and S.Y. "knows he can't help it, but she thinks he likes how it tastes." Again, S.Y.'s interviews with the GAL were conducted in 2023, during the 18 months when she lived with Ryan.[9] That the court used its discretion when reviewing S.Y. circumstances to find that Ryan's "alcohol abuse/overuse and aggressive behavior" were not in her best interest is fully supported by the record.

¶ 63    Ryan's claims that the court discounted Ami's interview with the GAL and that the GAL failed to order alcohol testing, evaluation, or treatment for him are of no avail. The GAL was appointed by the trial court to give an overview of S.Y.'s living conditions and provide an opinion on the effect relocation would have on her, not to evaluate whether Ryan has an alcohol problem or what should be done to rectify it. Additionally, we do not believe the

---

[9] Though the date of the fight S.Y. witnessed is not specified, it can be inferred that it was near to the time of the GAL's July 2023 interview. This is so because the GAL's report notes S.Y. recounted the fight upon the GAL's question of what she liked about living in Chicago, to which S.Y. responded her baby sister, but "she didn't feel she would see her for a while because" of the fight Ryan had with Ami.

court discounted Ami's, or anyone else's, interview or testimony. Again, the court stated in its Order and during its colloquy on Ryan's motion to reconsider that it considered everything presented before it. It is true the GAL reported that Ami, in her interview, "confirmed the argument" S.Y. described "and that police were called, but not that Ryan was drunk and not permitted to drive." However, there was much testimony regarding Ryan's alcohol use. The majority was from Bene and her witnesses and, obviously, this placed the court in the position of determining credibility between Ryan's former partner who moved for relocation and her relatives/friends, and his current partner who supports and has a child with him. But critically, and what else was before the court, was the testimony of Ryan's cousin, Holloman, which Ryan does not address here. Apart from her witnessing "heated" exchanges between Ryan and Bene during pick-up and drop-off of S.Y. that "always" took place "in front of" S.Y., Holloman admitted "she has witnessed Ryan drink alcohol." She testified that on one of these occasions, Ryan drank at her home, with S.Y. present. Though Holloman described him as "not intoxicated," she suggested he spent the night there and he obliged. She further admitted "on that occasion it was possible Ryan may have driven home with [S.Y. had he not stayed] because he didn't feel intoxicated."

¶ 64       Ultimately, the trial court found Ryan's use of alcohol, particularly in front of S.Y., was not in her best interest. Based on the record, and just as with all the other factors challenged by Ryan on appeal, we do not find any error in its determination that factor (11) favored Bene.

¶ 65                                         CONCLUSION

38

¶ 66  We are most certain Ryan loves S.Y. and genuinely wants her to live in Illinois so he can maintain a close relationship with her. Even the most cursory review of the record demonstrates this. Undeniably, he has fought since her birth to exercise his parental relationship with her, and he has, during certain periods of her life, been the parent to "raise" her. However, "[t]here is no perfect solution inherent in relocation cases, which are markedly difficult, no matter the outcome." *Kenney*, 2023 IL App (1st) 221558, ¶ 68. We sympathize, and we hope Ryan takes advantage of every opportunity he has been given pursuant to the allocation of parenting time awarded him by the trial court to foster that relationship in an appropriate way, both during S.Y.'s future visits to Chicago and his future visits to California. But, here, we find that the trial court's decision granting Bene's relocation petition was proper and reasonable based on the record and, therefore, there is no basis of error meriting reversal.

¶ 67  Accordingly, for all the foregoing reasons, we affirm the judgment of the trial court.

¶ 68  Affirmed.